## NEWSPAPER COMMENT ON CANDIDATES FOR THE BENCH.

Common Pleas Court of Cuyahoga County.

JAMES M. SHALLENBERGER v. THE SCRIPPS PUBLISHING CO., AND THOMAS H. BUSHNELL v. THE SCRIPPS PUBLISHING CO.

Decided, May 12, 1909.

*Libel and Slander—Proper Test as to Whether a Publication is Libelous —Truth of the Innuendo—Defaming a Class—Use of Figures of Speech—Comment on Candidates for the Bench.*

1. A demurrer to a petition in an action for libel admits the truth of so much of the innuendo only as is warranted by the natural meaning of the language used in the article.
2. Whether an article is libelous or not, is not to be determined from segregated parts thereof, but from the entire article, keeping in mind the theme of the composition, the circumstances and the occasion.
3. If a defamatory article relates to one or more of a class of persons and not to all of the class, and no person or persons are definitely specified, the particular person defamed is neither ascertained nor ascertainable and the words are not actionable.
4. An article printed in a newspaper shortly before a primary election, urging the selection of upright and efficient men as judges of the common pleas court, and stating that some of the candidates are "mere youths of limited experience," "police court and justice court lawyers," and "third-raters," is within the realm of fair comment and criticism on a matter of public interest and is not libelous.
5. Over-statements in figures of speech are not intended to be accepted as true, are not taken as true, and generally involve comparisons which are never true comparisons, and are never so intended or understood.
6. To say of any man who is a candidate for judge, that he is unfit to be judge, is not defamatory.

*Harper, Allen & Curts* and *M. B. & H. H. Johnson,* for the demurrer.

*H. H. McKeehan* and *Benj. A. Gage,* contra.

PHILLIPS, J.

Each of these actions is for libel. The petitions are identical in their averments, and the cases were argued and submitted together, upon a general demurrer to each petition,

The plaintiffs are, and for about twenty years have been, lawyers practicing at this bar. The defendant, an Ohio corporation, publishes a newspaper known as *The Cleveland Press*, of large circulation in this city and in this vicinity.

At the general election to be held in November, 1908, four judges of the court of common pleas were to be elected in this county, and these two plaintiffs, together with fourteen other members of this bar, had duly enrolled their names as candidates for nomination by the Republican party, when the defendant, on the 21st of August, 1908, published in its said newspaper the following:

"IF YOU ARE INTERESTED IN YOUR JUDGES YOU WILL BE INTERESTED IN THIS.

"The terms of four judges of the common pleas court of this county expire soon, and their successors are to be elected at the election in November.

"It is unfortunate that these judgeships are to be filled at the same election that presidential electors and a governor are to be chosen.

"There is danger that in the heat of national and state political discussion, the voters will not give proper attention to *the far more important matter of elevating to the bench men who are worthy of that high honor.*

"It is of no importance whatever whether Democrats or Republicans are elected to the common pleas bench; and yet there are thousands of voters so blind to their own interests and those of the community that they continue year after year to allow partisan feeling to dictate their choice of judges.

"The *Press* does not believe that this will be so always. It believes that *the time is not far distant when judicial nominations and elections will be entirely removed from partisan politics* in this county, and that good citizens of all parties will unite to select for the bench men of wisdom, experience, integrity, courage and judicial temperament, irrespective of whether they happen to be Democrats, Republicans, Prohibitionists or Socialists.

"But this year we are face to face with the duty of selecting four judges by the old political method; and all of us must meet the situation as it is.

"At the Republican primaries, Sept. 10, four candidates for the bench are to be nominated.

"The Democrats will nominate their four candidates at a later date by convention.

"Sixteen Republican lawyers have entered their names with the Republican committee as candidates.

"Looking over this list, we are amazed at the nerve, not to say impudence, of a majority of the sixteen.  Among them are *mere youths* whose experience at the bar has been so limited that they may be said to be apprentices in their profession; *police court and justice court lawyers* who are almost unknown in any court of higher jurisdiction, and others who by no possible stretch of the imagination could be classed higher than third-raters.

"It would be nothing short of a calamity should the Republicans of this county nominate such men for high judicial office with the danger always present in presidential year that a 'landslide' on election day will elevate them to the bench.

"The Lord knows that the bench of Cuyahoga county is now carrying about as big a burden of incompetence as it can stand if it is to retain in even the slightest degree the confidence and respect of the community.

"Accompanying this editorial are the pictures of six of the Republican aspirants for judicial honors.

"Out of the entire sixteen who have announced their candidacy, those six are the only ones who ought to receive the slightest consideration at the hands of the Republican voters.

"*Higley, Collister, Neff, Hogan, Sampliner, Vickery* are men of mature years, of long experience in their profession, of good reputation for ability, integrity, and at least some of the other qualifications which a judge ought to possess.

"If the Republicans will nominate any four of these six, and the Democrats will nominate Lawrence, Estep and two other equally able men, the honor of the blind goddess who adorns the county court house will be reasonably safe.  Otherwise she would better be guarded night and day by *at least one deputy sheriff.*"

It is alleged that the matter so published was false and libelous, and that it was written and published with the intent willfully and maliciously to injure these plaintiffs.  Of course, what is well pleaded in these petitions is admitted by the demurrers. But whether the article is *libelous,* depends not upon allegation, but upon the language and nature of the article, and the circumstances of its publication.  The same is true of the alleged *intent* of the publisher.

The general allegation of *falsity* has a limited application. It applies only to such statements of the article, and to such fair inference therefrom, as, *if true,* would tend to disparage or de-

grade the person, and subject him to public hatred, contempt or ridicule. So that, all such statements in the publication as would not, if true, have such tendency, are not admitted by demurrer to be false, and are not embraced within the general allegation of falsity.

The petition alleges, by unnuendo, that "the defendant meant, and intended to convey to the reading public * * * that plaintiff was of personal bad character and repute, and without honesty and integrity, and that he was unfit, incompetent and unqualified to practice his profession as an attorney and counselor at law."

It is the uniform holding of the courts, in Ohio and elsewhere, that the sense and meaning of the publication complained of must be found in the words used, when considered in the light of relevant facts and circumstances, and that their meaning can not be aided by innuendo. A typical statement of the rule is to be found in 7 Ohio Reports, part 1, page 193, in the words:

"The office of the innuendo is to direct to its object the charge made. It can neither enlarge nor restrain the natural sense and import of the words used; if they do not convey the sense and meaning when their application is explained, the innuendo can not aid them."

It follows that this innuendo, since it undertakes to enlarge the meaning of the words, is not well pleaded, and that its statements are not admitted by the demurrer to be true.

The general demurrer raises the question whether this publication is defamatory of these plaintiffs. To determine this question we must arrive at the true meaning and import of the publication. And it must be borne in mind that we are not to *put* a meaning *into* the words employed, but to *get* the meaning *out* of them; and to get their true meaning from them.

It is plain that we can not tell what the writer intended, by considering some segregated parts of what he has written. We must consider the entire article; we must keep in mind the *theme* of the composition, the circumstances, and the occasion.

When we consider this entire article, we find it to be an admonition to the voters of the county, as to the kind of men they should place upon the common pleas bench. The heading, which

is to call attention to the article, is this: "If you are interested in your judges, you will be interested in this." The writer then discourses upon the importance of care in the selection of judges, the immateriality of their politics, and the danger that, in the approaching election, the selection of judges may not receive proper attention. He deprecates the inefficiency of some who are on the bench; he criticises the fitness of some who are aspirants for the office; and he advises that nomination by the Republicans be made from the specified six, out of the sixteen aspirants. The general purpose is admonition, and not attack. Whatever attack is made is subservient of the general purpose, which is admonition. And I think it will appear that whatever attack is made upon these plaintiffs is an assertion of their unfitness for the office they seek.

The first half of this article makes no allusion to any candidates, and is so plainly not defamatory that I pass it without further consideration. As to the latter part of the article, wherein some of the candidates are mentioned, it is claimed in support of the demurrer that the language employed does not, with sufficient certainty, refer to and designate either of these plaintiffs in any parts thereof that are defamatory.

It is a well-settled rule that, in action for slander or libel, the defamatory words must refer to same ascertained or ascertainable person, and that person must be the plaintiff. If the charge relates to a number of persons, and is general, so as to embrace all of the group, then each one is specially referred to; but if the charge relates to one or more of a class of persons, and not to all of the class, and no person or persons are definitely specified, so that some are to be included and some are to be excluded, and it is uncertain as to the individual or individuals so included and so excluded, the particular person defamed is neither ascertained nor ascertainable, and the words are not actionable. For example, if I should say of a group of three men: "Those three men are thieves," each of the group is specifically referred to, and each may have his action. But if I should say, "One of those men is a thief," or if I should say, "There is a thief in this room," the person intended by the words is neither ascertained nor ascertainable, and the words are not actionable.

Passing the part of this article that is clearly not defamatory in its character, let us see if, in the rest of the article, these plaintiffs are sufficiently designated and referred to.

The writer says: "Sixteen Republican lawyers have entered their names with the Republican committee, as candidates. Looking over this list, we are amazed at the nerve, not to say impudence of a majority of the sixteen." So far as this expresses the amazement of the writer, it is certainly not defamatory. If it be defamatory to say of a man, that he has an amazing amount of nerve, and that he is impudent, of whom is this said—of a majority of the sixteen. This means nine or more of the sixteen, and it does not mean all of them. It clearly includes only a part of them, and it as clearly excludes a part of them; and it can not be told, from anything in the article, whether these plaintiffs are included. This language is, therefore, not defamatory of these plaintiffs.

The writer goes on: "Among them are mere youths, whose experience at the bar has been so limited they may be said to be apprentices in their profession; police court and justice court lawyers, who are almost unknown in any court of higher jurisdiction; and others who, by no possible stretch of the imagination, could be classed higher than third-raters." The persons spoken of here are designated as "among them"; that is, among the sixteen. This may mean two of the sixteen, or it may mean ten of the sixteen. It does not, with any certainty, refer to, or include, these plaintiffs and therefore does not furnish them any ground of complaint.

The writer says: "It would be nothing short of a calamity should the Republicans of this county nominate such men for high judicial office, with the danger always present in a presidential year that a 'landslide' on election day will elevate them to the bench." The statement is, that it would be a calamity if such men should be nominated. That is, if such men as the writer has said some of these sixteen are. This is not applied exclusively to men found within this group of sixteen; but, by fair implication, it does refer to men within that majority of the sixteen whom the writer has berated. But non constat that these plaintiffs are among those referred to.

Then follows this encomium upon the present occupants of the bench: ''The Lord knows that the bench of Cuyahoga county is now carrying about as big a burden of incompetency as it can stand, if it is to retain in even the slightest degree the confidence and respect of the community.'' Here, again, is uncertainty as to who are referred to. The words plainly do not embrace all the judges; *ergo,* no one is called upon to make denial. And I am not aware that any one wishes to admit, by the bringing of a suit for damages, that he is one of those so referred to.

But clearly these plaintiffs are not referred to, or even alluded to, in this part of the writing.

The writer proceeds: ''Accompanying this editorial are the pictures of six of the Republican aspirants for judicial honors. Out of the entire sixteen who have announced their candidacy, these six are the only ones who ought to receive the slightest consideration at the hands of the Republican voters. Higley, Collister, Neff, Sampliner, Hogan, Vickery, are men of mature years, of long experience in their profession, of good reputation for ability, integrity, and at least some of the other qualifications which a judge ought to possess.''

In the first part of this quotation the writer clearly says that ten of the sixteen candidates are unworthy the consideration of the Republican voters. If this is defamatory, of whom is it said? It is said of the ten whose pictures are not published. The ten who are not illustrious enough to be illustrated are unworthy, etc. If the petition contained the pictures, the ten depreciated gentlemen would be ascertained. As it is, none of the ten can be ascertained, and it does not appear whether these plaintiffs are within or without the degraded ten.

In the latter part of the quotation, six of the candidates are named, but it does not appear that they are the six whose pictures were published; and the qualified praise that is bestowed upon these six can not be complained of by these plaintiffs.

Here is the last paragraph of the publication:

''If the Republicans will nominate any four of these six, and the Democrats will nominate Lawrence, Estep and two other equally able men, the honor of the blind goddess who adorns the

county court house will be reasonably safe; otherwise she would better be guarded night and day by at least one deputy sheriff."

This paragraph, if taken seriously and literally, means that if any of the unnamed ten of the sixteen should be nominated, and also if the Democrats should not nominate four suitable men, the blind goddess would not be safe. In other words, none of the ten would be fit guardians of the goddess; and these plaintiffs are here included among the ten. But why these plaintiffs would not be fit guardians of the honor of the goddess, is not stated. At most, this figurative statement can not mean more than that these plaintiffs are not fit to be judges. And to say of any man who is a candidate for judge, that he is *unfit to be judge,* is not defamatory.

But this concluding paragraph is not a plain statement. The writer, in his solicitude for the goddess, and in his desire for climactic effect, has attempted to set his peroration in figures and tropes; and he has made a mess of it. The transition is ill-chosen. The humorous ending of a serious discourse marks an anti-climax.

The goddess of justice is one of the visionary deities of an extinct theology. It was purely ideal. The ancient sculptors enshrined this ideal in a statue. To us, this statue embodies and symbolizes the administration of justice—the dominion of law and order. To us, it is an inspiration rather than a guide. This statue in no sense involves the idea of protection by the judge; much less by the sheriff.

So, that, in the criticism of an aspirant for the bench, the only relevancy an allusion to the goddess can have, is that a fit man would emulate the ideal that is symbolized by the goddess, while an unfit man would not.

Dr. Lieber, in his work on Hermeneutics, says, that in construing a writing, while direct expression must be taken as direct, tropes must be taken as tropes. This is a rule of every day application. We all know that the overstatements in figures of speech are not intended to be accepted as true, and are not taken as true. Such exaltation of statement is allowed to a speaker or writer, to give stronger expression than plain statement would give, and to make pleasing expression. Most figures

of speech involve a comparison; and it is always an extravagant comparison. It is never a true comparison, and is never intended or understood to be a true comparison. It is a sort of rhetorical flourish of language; and, of necessity, a figure of speech can never have a *definite meaning*. If we say of a man, "He is a pillar in the church," we speak in complimentary terms, but we convey no definite meaning. He may deserve the commendation for any of a score of reasons, not one of which is stated or insinuated. If we say of a church member, that he is not a pillar in the church, we have not affirmed anything derogatory of him, and we have not degraded him, for a very good church member may not come up to the metaphorical standard of a pillar, which sustains the edifice. If we say of a lawyer, "He is not a Choate or a Webster," we have not degraded him. And if we say of a judge "He is not a Marshall or a Shaw," we have not degraded him. And if we say of a candidate for the bench, "he is not fit to be a judge," we have not degraded or defamed or calumniated him, for we have not said anything that is against his character or standing as a man or as a lawyer. We all know there are good men and good lawyers that would not make good judges.

If this last paragraph of the publication complained of means that these gentlemen, if made judges, would not come up to the ideal that is enshrined in the statue of Justice (and it can not mean more than this), it is not defamatory, for they might be good judges, and yet fall below that ideal standard; for such high standard is seldom, if ever, attained.

The "freedom of the press," so important to the well-being of society that it is protected in both national and state constitutions, is not involved in the consideration of this demurrer. This constitutional protection was never intended to shelter the "press" from liability for defamatory publications. I quote again from the case in 7 Ohio, 193:

"To permit the press to become the instrument of malicious ridicule and contempt of individual character, would not only corrupt the moral taste, but speedily set society by the ears; and the common good of every people demands that thus far it should be restrained. An editor may, nevertheless, comment

freely on the acts of government, of officers, or of individuals, and indulge in occasional mirth and wit; and it is only when the character of the publication is malicious, and its tendency is to degrade, and to excite to revenge, that it is condemned by the law, and subjects the publisher to a prosecution.''

An English law-writer says:

''The liberty of the press is no greater, and no less, than the liberty of every subject of the Queen. But newspaper writers, though in strict law they stand in no better position than any other person, are generally allowed greater latitude. It is regarded as in some measure the duty of the press to watch narrowly the conduct of all government officials, and the working of all public institutions, to comment freely on all matters of general concern to the nation, and to fearlessly expose abuses.'' Odgers on Libel, 184.

I find the law to be well settled that a publication which is a fair comment and criticism on a matter of public interest is not libelous. Under this rule of law, when a man offers himself as a candidate for a public office, his fitness for the office he seeks is always regarded as a proper subject for fair comment and criticism.

What may be fair comment and criticism will depend, in no small degree, upon the character of the office sought, and upon the physical, mental and moral qualities required to fit a man to discharge properly and well the duties of the position.

The court of common pleas is the most important tribunal in our judicial system; and in no other court is better qualification for the work demanded. It is a court of general jurisdiction. It is the court where most of our litigation begins, and where most of it ends. It is the court that is nearest to the people. Here, in earnest and sometimes bitter contention, under the sway of interest, of passion, of bias and prejudice, and sometimes of perjury, the rights of the contending parties are to be determined, and they ought to be determined rightly.

To preside over such contention, to hold it within proper bounds, and yet with no unfair restriction; meanwhile to decide questions of substantive law, of pleading, of evidence, and of practice, and to decide these with reasonable promptness; and

to do this continuously, day after day, year after year, in all
sorts of cases, and to make few mistakes, requires a man of good
physical constitution, and of good mental endowment. He must
have a mind well poised and well disciplined. He must be a
man of legal learning, and of legal discrimination. He must be
a man of experience; and his experience must be of a kind that
qualifies him for the work he is to do.

Moreover, when we consider that the court of common pleas has
to. do, continuously, with all our business relations, with our
social and domestic relations, with our property rights, with
our rights of life, of personal liberty and of personal security,
with the restraint and punishment of wrong-doers, we can realize
how important the personnel of the court of common pleas is
to the well-being of all our people, and in all the relations we
sustain. So important is the efficient and fair administration of
justice, that nothing tends more certainly to the destruction of
the community and of the state, then deficiency or default in
this department of our governmental system.

Certainly nothing could be more pretentious than for a man,
materially wanting in these requisite qualifications, to offer him-
self as a candidate for such office; and when these sixteen gentle-
men offered themselves as candidates for such office, they volun-
tarily submitted themselves to fair comment and criticism as to
their personal fitness for the office.

To say of candidates for such office that they are wanting in
experience, and that their experience has not been of a kind to
qualify them; to say of them that they ought not to receive the
slightest consideration at the hands of the Republican voters;
that at best they are only third-raters, whatever that may mean,
and that, as judges, they would not come up to the high ideal
that is symbolized by the blind goddess, whatever that may
mean, is certainly not going beyond fair criticism, especially
when the writer makes way for it by the undenied statement that
"the bench of Cuyahoga county is now carrying about as big a
burden of incompetency as it can stand."

In South Carolina, the court sustained a demurrer to a petition
charging. that the defendant had said of and concerning the
plaintiff, who was a candidate for. Congress, that his mind was

injured and his understanding impaired by disease, and that he could never be depended on. In the opinion, the court said:

"When one becomes a candidate for public honors, he makes profert of himself for public investigation. All his pretensions become proper subjects of inquiry and discussion. He makes himself a species of public property, into the qualities of which every one has a right to inquire, and of the fitness of which every one has a right to judge and to give his opinion. The ordeal of public scrutiny is many times a disagreeable and painful operation, but it is the result of that freedom of speech which is the necessary attribute of every free government, and is expressly guaranteed to the people of this country by the Constitution. * * * The Constitution has fixed no grade of mind which is necessary to qualify a person for a seat in Congress; neither have we any intellectual scale by which to measure the understanding. It is a question on which a man may differ in opinion from all the rest of the world—on which he has a right to differ from them all, and to express his opinion." 1 Nott & McCord, 348.

I believe the authorities are uniformly to the effect that when one offers himself as a candidate for public office, his qualifications and fitness for the office he seeks may be freely discussed and commented upon, in the newspapers or otherwise, so long as the comments are fair, are in good faith, and are limited to his fitness for the office.

Upon a somewhat careful consideration of the article complained of, in the light of the authorities in point, I must find that while some of the language employed is coarse and harsh, and while some of the statements are unpleasing and derogatory —perhaps hyperbolical—they are not, in their nature and under the circumstances, calumnious or defamatory.

I must find that while there is much in the article that is both critical and censorious, it does not go beyond that fair comment and criticism which the law allows of one who offers himself as a candidate for a public office that so closely concerns the general welfare as does the office sought by these plaintiffs.

I must further find that the criticisms complained of do not, with any certainty, refer to these plaintiffs, or to either of them, so as to give to them, or either of them, a right of action, even if the article were in its nature defamatory and actionable.

Both demurrers are sustained.