**SWEITZER, Appellant,**

v.

**OUTLET COMMUNICATIONS, INC., d.b.a. WCMH–Channel 4 et al., Appellees.**

[Cite as *Sweitzer v. Outlet Communications, Inc.* (1999), 133 Ohio App.3d 102.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 98AP–745.

Decided Aug. 5, 1999.

104

*Plymale & Associates* and *John M. Gonzales,* for appellant.

*Vorys, Sater, Seymour & Pease L.L.P., C. William O'Neill* and *Douglas R. Matthews,* for appellees.

BOWMAN, Judge.

Plaintiff-appellant, Darrell Sweitzer, filed a complaint in the Franklin County Court of Common Pleas against defendants-appellees, Outlet Communications, Inc., d.b.a. WCMH–Channel 4 ("WCMH"), and Richard Skidmore.

The complaint set forth claims for relief based on defamation and conspiracy. The claims stem from a broadcast of a story prepared by Skidmore, an investigative reporter employed by WCMH, about a dispute between appellant, who is a jeweler, and a customer over the sale of a diamond. The common pleas court awarded summary judgment in favor of appellees and dismissed appellant's claims. Appellant appeals the decision and presents the following assignment of error:

"The trial court erred in sustaining defendants–appellees' motion for summary judgment."

In June 1994, Craig Housley began to shop for a diamond engagement ring. In the course of his shopping, Housley learned about the grading scale for diamonds used by the Gemological Institute of America ("GIA"). Although there are several grading systems for diamonds, the GIA standard is one of the primary industry standards. Various aspects of a diamond, including clarity and color, are graded. Clarity grades are based on the nature and the location of imperfections, known as inclusions, and are expressed by letter abbreviations. Under the GIA standard, the top grade is flawless, FL. In descending order are the grades F, no inclusions and only significant blemishes; VVS–1 and VVS–2, minute inclusions that are difficult to see; VS–1 and VS–2, minor inclusions; SI–1 and SI–2, noticeable inclusions; and I–1, I–2 and I–3, obvious inclusions. The color grades are designated with letters. The less color within the diamond, the higher on the alphabetical scale the diamond is graded, with D being the best possible grade. Thus, diamonds graded D, E, and F are classified as colorless; grades G, H, I, and J are near colorless; grades K, L, and M are faint yellow; grades N through R are very light yellow; and grades S through Z are light yellow.

Housley visited New Olde Village Jeweler ("NOVJ") and was shown a diamond by an employee, Marc Pfannenstein. Housley alleges that the stone was represented to be graded on the GIA scale as SI for clarity and GH for color, and priced at $1,850. Housley further alleges that, on a subsequent visit, appellant, a graduate gemologist employed at NOVJ, confirmed this grade. Appellant disputes Housley's allegations and contends that he told him that the diamond's clarity grade was SI–2, SI at best, and that its color grade was J at best. He denies mentioning G or H as color grades. In his written appraisal, using his own grading system, appellant described the stone color as white and clarity as slightly included. A comparison chart prepared by appellant indicates that the equivalent GIA color and clarity grades are G, H, I, J, and SI–1 through I. There is no evidence indicating that appellant provided Housley with a comparison chart between appellant's own grading system and the GIA grading system.

Housley bought the diamond from NOVJ in July 1994 for $1,796.69, and had it set in a band. After picking up the ring, he took it to International Diamond and Gold for a second opinion. Steward Gibboney, the graduate gemologist who looked at the stone, gave it a lower clarity and color grade, I–1 and I, J or K, respectively, and told Housley that the stone had been laser drilled, which made it less valuable and the NOVJ should have disclosed the fact that it was drilled.

Housley then returned to NOVJ for an appraisal. The appraisal, prepared by appellant, states that the diamond's current retail value is $2,895, describes its

clarity as slightly included and its color as white and makes no mention of the laser drill hole. Housley subsequently confronted appellant about the laser hole and grading disparity. Appellant claimed that he did not know the diamond had been laser drilled and offered Housley a replacement stone that Housley found unsatisfactory and declined. Anticipating litigation, Housley kept the diamond despite the fact that appellant and NOVJ did not cash the check for the ring.

NOVJ sued Housley for the return of the diamond. Housley countersued NOVJ for the sale of the diamond with an undisclosed laser drill and a lower GIA grade than had been indicated. Housley also reported his complaint to the Ohio Attorney General and, in August, called appellee Richard Skidmore, a television reporter, and told him about the litigation and its underlying facts.

In the course of investigating the story, Skidmore interviewed Gibboney. Skidmore also took the diamond to another graduate gemologist, whose name Skidmore agreed not to disclose, who looked at the diamond, graded it, and confirmed that it had been laser drilled. Skidmore also interviewed appellant and Housley. Skidmore prepared a two-part story, entitled *Dirty Diamonds*, that aired on WCMH–TV; the main story aired on September 22, 1994, at 11:00 p.m., and the second story aired the following day at 6:00 p.m.

As a result of the *Dirty Diamonds* story, NOVJ filed an action for defamation and conspiracy against WCMH in the United States District Court for the Southern District of Ohio on September 24, 1994. A year later, on September 21, 1995, appellant filed his own defamation action, based on the *Dirty Diamonds* story, in the Franklin County Court of Common Pleas. The common pleas court issued its decision granting appellees' summary judgment motion on May 14, 1998. Appellant's appeal from this decision is presently before this court. In an October 27, 1998 order that considered many of the same issues and referred to the common pleas court decision, the district court granted summary judgment to WCMH.

Appellate court consideration of summary judgment motions is *de novo*. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841, 843–844. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343, 345. The moving party bears the initial burden of informing the trial court of the basis for the motion by identifying the portions of the record that establish the absence of a genuine issue of fact on a material element of the

nonmoving party's claim. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 272–274.

After the moving party satisfies its initial burden, the nonmoving party bears a reciprocal burden to respond by affidavit or as otherwise provided in Civ.R. 56 and must set forth specific facts showing the existence of a genuine issue for trial. Civ.R. 56(E). If the nonmoving party fails to so respond, summary judgment, if appropriate, shall be entered against him. Civ.R. 56(E).

Appellant contends that Skidmore's story contains false statements of fact that were defamatory and that appellees negligently failed to discover the falsity of these statements.

Appellees assert that the allegedly false statements do not go to the gist of the story and that uncontroverted evidence establishes their substantial truth. Specifically, appellees note that appellant does not dispute that the diamond was laser drilled, that laser drilling should be disclosed to a customer, and that every other gemologist who examined the stone noted the laser drill and gave it a lower grade than appellant. Nor is it disputed that no one outside of NOVJ gave the stone an appraisal value as high as appellant did. Further, appellees contend that there is no evidence that they acted with actual malice or negligence regarding the truth or falsity of the broadcast statements.

Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business. *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 145–146, 486 N.E.2d 1220, 1222–1223. The essential elements of a defamation action are that the defendant made a false statement, that the false statement was defamatory, that the false defamatory statement was published, that the plaintiff was injured, and that the defendant acted with the required degree of fault. *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 346–347, 535 N.E.2d 755, 759.

There are two forms of defamation: libel and slander. Generally, slander refers to spoken defamatory words and libel refers to written defamatory words. *Retterer v. Whirlpool Corp.* (1996), 111 Ohio App.3d 847, 857, 677 N.E.2d 417, 423–424. However, 3 Restatement of the Law 2d, Torts (1977) 182, Section 568A provides that a defamatory matter broadcast by means of radio or television is classified as libel. See *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 520 N.E.2d 198 (court uses libel to refer to defamation action based on a news broadcast).

Appellant relies on several statements in the broadcast to support his position that there are genuine issues of material fact that preclude a grant of summary judgment on his defamation claim.

In addition to the main story, which focused on the dispute between appellant and NOVJ and Housley, there was a follow-up story that repeated portions of the main story and then provided tips for diamond buying. There were also four promotions aired before the stories.

One of the statements that appellant relies on was a promotion that aired the day before the main story. It provides, in full, as follows:

"One of these diamonds is worth two grand, the other about half that. Can you tell the difference? A customer who couldn't paid the price, and we decided to look into it. I'm Rich Skidmore with the Target 4 report, tomorrow night at 11."

Three other statements that appellant relies upon were made during the main story and were repeated in the follow-up story:

"COLLEEN MARSHALL: The old song says they are a girl's best friend. Whether for an engagement or an anniversary or another very special occasion, a diamond can help make the ultimate impression.

"CABOT REA: Yeah, it can make a considerable impact on your pocketbook as well. A big court battle is now shaping up over a questionable diamond sale. A local jeweler made it to a future bridegroom and Target 4's Rich Skidmore is here now with all the facts in this interesting case.

"SKIDMORE: Cabot and Colleen if you've every [*sic*] seriously shopped for the precious stone, you know how precious of an investment it is, but oh how much you need to know to make sure of what your money's buying. One customer came to Target 4 after learning the diamond he bought wasn't what the jeweler led him to believe. The jeweler, a graduate gemologist, called that because of special training he completed, claims he did nothing wrong. We asked some independent experts about it.

"Their brilliance is captivating. Their cost, stupefying, and to the untrained eye their appearance can be deceiving. Corporate pilot and future bridegroom, Craig Housley, learned that the hard way. * * *

"HOUSLEY: I just trusted his professional opinion and that I was getting what I was paying for.

"SKIDMORE: * * * Housley consulted gemologists here at the Olde Village Jewelers in Dublin. They decide the diamond that best fits his budget and preference is a ¾ carat stone on a particular level of a diamond grading system that sets standards for the industry. Housley wanted a diamond with a clarity grading of SI–1 or 2 * * *. This is what that type of diamond looks like to the naked eye. * * * Now this is the diamond Craig Housley says he was buying from Olde Village Jewelers. To the naked eye, it looks almost identical. *But two local graduate gemologists we took it to for a closer look, independent experts,*

*are saying the same thing. That it's far from being the grade of diamond for which Housley agreed to pay nearly $2,000.*

"GIBBONEY: But this particular stone, this has a very low clarity rating. Okay. An I–1, which is actually causing problems internally with the stone.

"SKIDMORE: The experts we went to say the color level is lower as well. *3 or 4 grades lower in the K range.* And under the microscope a whole new flaw is revealed. A drill mark from a treatment process called laser drilling.

"GIBBONEY: What they'll do is they'll open it up a pathway, drill out part of the inclusion and then bleach it out so it's more of a white inclusion and it doesn't really stand out to the naked eye.

"SKIDMORE: *The Jewelers Vigilance Committee, a non-profit watchdog group, and many jewelers believe laser drilling should always be disclosed to customers.*

\* \* \*

"SKIDMORE: It might improve the look of the stone, but *by changing its natural condition, experts say the drilling dramatically decreases the diamond's value,* as does the lower grading. Housley didn't notice the drill mark when he carefully studied the stone under the scope before deciding to buy it. And the jeweler didn't mention it. Not even in the appraisal. The bridegroom discovered it wasn't the stone he thought it was when he took it to another jeweler for a second opinion.

"HOUSLEY: I felt cheated, obviously. And I was shocked." (Emphasis added to indicate the disputed statements.)

█ Regarding the first disputed statement, appellant questions whether two independent experts were consulted and the use of the terms "far from" and "three to four grades lower." Appellant also disputes the independence of Gibboney because he works for International Diamond and Gold, a competitor, and the store where Housley took the diamond for a second opinion and from whom he ultimately purchased an engagement ring. Appellees contend that the language at issue is either opinion or substantially true.

██ A defamation action may be completely defended by showing that the gist, or imputation, of the statement is substantially true, and, hence, the statement is not false. *Natl. Medic Serv. Corp. v. E.W. Scripps Co.* (1989), 61 Ohio App.3d 752, 755, 573 N.E.2d 1148, 1149–1150. Whether a defamatory statement is substantially true is a question of fact. Cf. *Young v. The Morning Journal* (1996), 76 Ohio St.3d 627, 669 N.E.2d 1136 (summary judgment was improper because there was a question as to whether the report was substantially accurate pursuant to R.C. 2317.05).

Under Ohio law, opinions are constitutionally protected speech. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 280, 649 N.E.2d 182, 183–184. Whether allegedly defamatory language is opinion or fact is a question of law. *Id.* A totality-of-the-circumstances test is used to determine whether a statement is fact or opinion. *Vail,* at 282, 649 N.E.2d at 185–186. This is a fluid test and calls for the court to consider the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared.

Although the overall character of the story is a factual investigative report, this court finds that "independent" and "far from" lack precise meaning and are opinion. Furthermore, if they were factual statements, any possible falsity on their part does not affect the substantial truth of the statement as a matter of law — that at least one other graduate gemologist examined the stone and gave it a lower grade.

Appellant also disputes the statement that the color grade he gave the diamond was three to four grades lower than that given by the independent expert. First, as to his written appraisal, appellant states that his grade of white is equivalent to the GIA's scale of G, H, I or J, and that because the expert gave the color an I, J, K rating, his grade was the same as the color grade of Gibboney. Appellant argues that, even if Housley's claim that appellant told him that the GIA color grade of the diamond was G, and H is true, this grade was not three to four grades higher than the color grade Gibboney gave the diamond because there is only a one-grade difference between G, H and I, J, K.

This court finds that the statement that experts gave the stone a color grade three to four levels lower than appellant is a factual statement, but substantially true as a matter of law. The highest GIA grade attributable to the diamond based upon appellant's grade is a G, and the lowest grade the expert gave the diamond was a K. Because there is a four-grade difference between these grades, the contested statement is substantially true.

Turning to the final statement at issue in the main story, appellant asserts that Skidmore's statement that laser drilling dramatically decreases a diamond's value is false. The only evidence in the record that laser drilling decreases a diamond's value is Skidmore's deposition testimony that Gibboney told him this and that the second gemologist confirmed it; however, other evidence in the record contradicts this testimony. Robert Benowitz, an expert for appellant, stated in his deposition that diamonds retain their value after a successful laser drilling procedure. James Lininger, an expert for appellant, stated in his deposition that laser drilling can make a diamond more valuable. Cosmo Altobelli, an expert for appellees, testified in his deposition that laser

drilling usually increases the diamond's clarity grade and, thus, increases its value. Thus, the falsity of the statement, while not certain, is definitely at issue.

The trial court found that, despite the statement being imprecise at best and entirely inaccurate at worst, it did not support a claim of defamation because, from the context of the story, it was clear that the intended message was that a diamond that has been laser drilled has a lower value than a diamond with the same color and clarity grades that has not been laser drilled. Although this court does not find the trial court's interpretation of the statement to be the only possible interpretation, it is a reasonable interpretation.

▮▮▮ Appellate courts in Ohio have construed *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, as adopting the innocent-construction rule. See, *e.g., Van Deusen v. Baldwin* (1994), 99 Ohio App.3d 416, 419, 650 N.E.2d 963, 964; *Robb v. Lincoln Publishing (Ohio), Inc.* (1996), 114 Ohio App.3d 595, 618, 683 N.E.2d 823, 838; and *Leal v. Holtvogt* (1998), 123 Ohio App.3d 51, 81, 702 N.E.2d 1246, 1265–1266. This rule provides that, if an utterance is reasonably susceptible of both a defamatory and an innocent meaning, as a matter of law, the innocent meaning is to be adopted. *Yeager* at 372, 453 N.E.2d at 669–670. Under the innocent-construction rule, whether a statement is defamatory will essentially always be a question of law. Thus, because there is a reasonable innocent construction, as a matter of law this construction must be adopted. Accordingly, this statement is not defamatory and the trial court properly determined that this statement cannot support appellant's claim for defamation.

▮▮▮ As to the promotion statement, appellant contends that the message this statement conveys is that the diamond was sold to Housley for $1,000 more than it was worth, or twice its value. The trial court acknowledged appellant's interpretation but also found that it could be reasonably interpreted as warning customers that they should be aware of factors that affect diamond values and was showing, as an example, two diamonds similar in appearance but of different value. The trial court found that the latter interpretation was not defamatory and, applying the innocent-construction rule, found that the promotional spot did not support appellant's defamation claim.

Appellant asserts that the trial court erred when it found that a reasonable construction of the statement was that Skidmore was simply showing an example of two diamonds with different values. Appellant contends that, when the statement is considered in its entirety, this innocent construction is not reasonable.

After carefully considering this promotional statement in context, this court concludes that the trial court correctly determined that the statement was

reasonably capable of both the construction urged by appellant and the innocent construction it found. Therefore, the trial court properly applied the innocent-construction rule and determined that the promotional spot does not support appellant's defamation claim.

██ Appellant's final argument concerns the broadcast statement that the Jewelers Vigilance Committee ("JVC"), a nonprofit watchdog group, recommended that laser drilling be disclosed to customers. When this statement was made, the television screen showed a portion of a letter JVC had sent appellant. In this letter, JVC's general counsel was responding to appellant's inquiry regarding his dealer's alleged failure to disclose to appellant that the diamond appellant sold to Housley had been laser drilled. The letter conveys JVC's belief that dealers should disclose laser drilling.

Although the letter does not state that laser drilling should be disclosed to retail customers, this court finds the broadcast statement that JVC recommends disclosing laser drilling to customers to be substantially true and, therefore, not false. If a retail jeweler purchasing a diamond from a dealer should be advised that a diamond has been laser drilled, then certainly a retail customer who purchases a diamond from a retail jeweler should be advised of laser drilling. Also, the consensus among the witnesses was that laser drilling should be disclosed to retail customers.

██ The display of a portion of the JVC letter to appellant is a separate matter. Appellant argues that the only reasonable construction of this image is that a nonprofit group was investigating appellant as a result of his dispute with Housley. The trial court applied the innocent-construction rule and found a reasonable interpretation of this image to be that JVC was merely giving its opinion regarding disclosure to customers. Appellees contend that appellant's interpretation of the message conveyed by displaying the letter is tortured and that applying the innocent-construction rule disposes of the issue in appellees' favor.

While this court does not find appellant's construction tortured, appellant's defamatory construction is not the only reasonable interpretation. This court agrees with the trial court's conclusion that the image could reasonably be interpreted as stating that the JVC was simply giving its opinion regarding disclosure of laser drilling and that this construction is not defamatory. Consequently, as a matter of law, the image of the JVC letter is not defamatory and does not support appellant's defamation claim.

Applying the innocent-construction rule, we are compelled to affirm the trial court. Unfortunately for appellant, an unfair broadcast is not necessarily defamatory.

For the above reasons, this court finds that there are no genuine issues of material fact in support of appellant's defamation claim. Appellant's single assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROWN and JOHN C. YOUNG, JJ., concur.

JOHN C. YOUNG, J., retired, of the Tenth Appellate District, sitting by assignment.