OPINION
{¶ 1} Plaintiff-appellant, Reginald A. Cooke, appeals from the June 18, 2002 judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Larry James ("James") and Crabbe, Brown, Jones, Potts Schmidt ("Crabbe, Brown") on Cooke's defamation and civil conspiracy claims. Because genuine issues of material fact exist, we reverse.
 {¶ 2} Cooke is an attorney-at-law engaged in private practice who maintains an office in Columbus, Ohio. In February 1996, Cooke was hired to represent Maude Williams and her son Michael Williams, both of whom are former employees of defendant United Dairy Farmers, Inc. ("UDF"). The Williamses are African-American and, in 1995, they filed race discrimination complaints with the Ohio Civil Rights Commission ("OCRC") claiming that they had been fired from their jobs at UDF due to their race. Prior to Cooke's involvement in the proceedings, attorney Daniel Klos represented the Williamses. At the time Cooke first met the Williamses and became involved in their cases, all testimony had been submitted to the OCRC, including the testimony of a former UDF assistant manager, Patty Munyan.
 {¶ 3} In August and October 1996, Cooke filed civil actions in federal court on behalf of the Williamses and against UDF. One of the witnesses Cooke intended to call at trial to substantiate allegations of racially biased attitudes and actions of UDF supervisory personnel was Patty Munyan, who had worked at the same store as the Williamses.
 {¶ 4} In 1997 or 1998, Munyan became involved with Warren Freeman, who at the time had been convicted of approximately one dozen criminal offenses since the age of 18. In March 1998, Freeman offered to sell to UDF a videotape of Munyan, which Freeman claimed to have surreptitiously recorded. The tape is approximately 10 minutes long, and according to Freeman's affidavit, Freeman recorded the tape without Munyan's knowledge by hiding a video camera under dirty laundry in a laundry basket in the bedroom of the apartment where Freeman and Munyan were staying. The tape is a full size VHS cassette, and if, as UDF indicated, that tape was the original, Cooke contends that a full size VHS camera necessarily recorded it. Upon viewing the tape, it appears the camera was level while the recording was made, the camera lens is not obscured by laundry or any part of the laundry basket, and the volume is not muffled. However, it is difficult to make out some of the dialog, because the camera was apparently near a television that was playing, and the tape picks up both the sound from the television and Munyan and Freeman's voices. It is not clear who turned the camera on or off to record the conversation, but a few seconds after the tape begins, Munyan assumes a position on a mattress where she is almost perfectly centered in the camera's field of view, and she remains centered for the duration of the tape.
 {¶ 5} The following exchange occurred on the tape:
 {¶ 6} "Mr. Freeman: What the hell happened anyway?
 {¶ 7} "Ms. Munyan: They was saying that a supervisor — some supervisors at work where I work on Frebis were discriminating. And they weren't really, you know. Maudie Williams just caused a bunch of trouble. And she talked to me and asked me to go on the Civil Rights Commission and said whatever she gets she'll split. I said Okay. All I had to do is do what her and her lawyer said, and that's what I did."
 {¶ 8} Munyan continued:
 {¶ 9} "Well, at the time that I did it I thought I was doing the right thing and I thought a little lie wouldn't hurt. I didn't know it was going to be all this. Because when I talked to Reggie and them about it they said, Oh, they'll settle quick."
 {¶ 10} She further explained:
 {¶ 11} "I worked for them for eight years and then I get shit on. I didn't get nothing out of it, that's for damn sure. When she asked me to go up there to Civil Rights, she told me she'd pay me if she got anything out of it and I did it."
 {¶ 12} Munyan never states on the videotape that she agreed to testify falsely for Cooke and never states that she was to receive money that Cooke anticipated receiving from UDF. Rather, at the time Munyan made her statements to the Ohio Civil Rights Commission, a different attorney represented the Williamses.
 {¶ 13} UDF purchased the videotape from Freeman for $10,000, and working with the public relations firm of Edward Howard Co. ("Edward Howard"), held a press conference at the Hyatt on Capital Square Hotel on June 4, 1998. According to Edward Howard's billing records, James had several communications with Edward Howard, including a "news conference phone discussion" with Wayne Hill on June 3, 1998, the day before the press conference.
 {¶ 14} Defendant, Brian Gillan, Chief Operating Officer and general counsel for UDF, was the chief presenter at the press conference. James, trial counsel for UDF in the race discrimination litigation, sat together with Gillan at the presenters' table. No other employee of Crabbe, Brown was present. During the press conference, Gillan delivered prepared remarks to the reporters, and following the prepared remarks, both Gillan and James responded to reporters' questions. The Freeman/Munyan videotape was played at the press conference, copies of the tape were distributed, a transcript of the tape was distributed, and reporters who attended were given press packets stating, among other things, that Cooke knew that the Williams' legal claims were false, that he was part of a fraudulent scheme to force money from the company, and that Munyan agreed on the tape to testify falsely for Cooke. The printed press packet materials distributed at the press conference stated that:
 {¶ 15} "Munyan admits on the tape that she agreed to testify falsely for Michael and Maudie Williams and Cooke. In exchange for her testimony, Munyan was to receive a percentage of the money that Williams' mother and Cook anticipated receiving in an out-of-court settlement by UDF."
 {¶ 16} On the morning of the press conference, James had a motion for sanctions filed in federal court in the Williams v. UDF case. In his motion, James discussed the Munyan videotape and accused Cooke of "fraud on the court," the "grossest abuse of the judicial system," a "promise to pay a witness for false testimony," and of filing documents with the court with "knowledge that certain key allegations were false." However, during the press conference itself, James indicated that he was not accusing Cooke of anything. James did state, however, that he had an obligation to report Cooke to the disciplinary counsel.
 {¶ 17} During discovery, James indicated that he played no part in developing the oral presentation Gillan made or the written materials UDF distributed at the press conference. James stated that he intended to attend the press conference as part of the audience, but Gillan asked him to join him at the front of the room. James stated that he did not know in advance of the press conference what Gillan intended to say, and that he only learned of the statements when he first heard them at the event on June 4, 1998.
 {¶ 18} On June 3, 1999, Cooke filed a complaint for libel, slander, and conspiracy against UDF, Brian Gillan, Larry James, and Crabbe, Brown. After discovery, the defendants filed motions for summary judgment, and Cooke filed a motion for partial summary judgment.
 {¶ 19} On June 18, 2002, the trial court found in favor of James and Crabbe, Brown on all claims. The trial court found that James' comment about a disciplinary referral was a statement of opinion and therefore protected by, and immune from a defamation claim. The trial court further found no evidence from which a jury might conclude James conspired with UDF or Gillan to defame Cooke or from which James or Crabbe, Brown could be held liable for the statements published by UDF and Gillan.
 {¶ 20} This appeal followed, with Cooke assigning as error the following:
 {¶ 21} "1. The trial court erred in sustaining defendants-appellees' motion for summary judgment.
 {¶ 22} "2. The trial court erred in ordering that portions of the record of this action be sealed from public disclosure."
 {¶ 23} In his first assignment of error, Cooke argues that a genuine issue of material facts exists concerning James' level of involvement in the planning and execution of the June 4, 1998 press conference. Cooke contends that the trial court improperly weighed James' denial of any involvement with Cooke's circumstantial evidence of his involvement in the press conference, and erroneously concluded that James did not cause or participate in the publication of the defamatory material.
 {¶ 24} Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame, or disgrace, or affecting the person adversely in his or her trade or business. Knowles v. Ohio State Univ., Franklin App. No. 02AP-527, 2002-Ohio-6962; Sweitzer v. Outlet Communications, Inc. (1999), 133 Ohio App.3d 102, 108, citing Matalka v. Lagemann (1985), 21 Ohio App.3d 134, 136. Slander refers to spoken defamatory words, while libel refers to written or printed defamatory words. Mallory v. Ohio Univ. (Dec. 20, 2001), Franklin App. No. 01AP-278, citing Lawson v. AK Steel Corp. (1997), 121 Ohio App.3d 251,256. To establish defamation, a plaintiff must show: (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the statement, and (5) the defendant acted with the required degree of fault. Sweitzer, supra.
 {¶ 25} Any act by which defamatory matter is communicated to a third party constitutes publication. Hecht v. Levin (1993),66 Ohio St.3d 458, 460, citing 3 Restatement of the Law 2d, Torts (1965), Section 577(1) at Comment a. "As a general rule, all persons who cause or participate in the publication of libelous or slanderous matter are responsible for such publication * * *. Hence, one who requests, procures, or aids or abets, another to publish defamatory matter is liable as well as the publisher." Scott v. Hull (1970), 22 Ohio App.2d 141,144, quoting 53 Corpus Juris Secundum 231, Libel and Slander, Section 148. Thus, liability to respond in damages for the publication of defamation must be predicated on a positive act. Scott v. Hull, supra. Nonfeasance, on the other hand, is not a predicate for liability. Id. Mere knowledge of the acts of another is insufficient to support liability. Kerlin v. Zahn (C.A.6, 1985), 782 F.2d 1042.
 {¶ 26} Under Ohio law, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." Kenty v. TransAmerica Premium Ins. Co. (1995), 72 Ohio St.3d 415,419. While a plaintiff need not show an express agreement in order to demonstrate a malicious combination to injure, he must put forth evidence of "a common understanding or design * * * to commit an unlawful act." Gosden v. Louis (1996), 116 Ohio App.3d 195, 219.
 {¶ 27} Ohio recognizes the tort of conspiracy to commit defamation, as the Ohio Supreme Court has held that "[w]here a slander is uttered by one or more persons, pursuant to a conspiracy which includes among its purposes the defamation of another, all parties to the conspiracy are jointly liable and may be joined as parties defendant in the same action." Schoedler v. Motometer Gauge Equipment Corp. (1938), 134 Ohio St. 78, paragraph one of the syllabus.
 {¶ 28} As to Cooke's contention that summary judgment was improperly granted, Civ.R. 56(C) states that summary judgment shall be rendered forthwith if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."
 {¶ 29} Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 65-66. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996), 75 Ohio St.3d 280,292. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. Id. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359.
 {¶ 30} Appellate review of summary judgments is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588; Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988),42 Ohio App.3d 6, 8. We stand in the shoes of the trial court and conduct an independent review of the record.
 {¶ 31} Here, Cooke argues that apart from any of James' own allegedly defamatory statements, James is also liable for all the defamatory statements that were published during the press conference by Gillan and UDF because James helped organize the press conference, distributed the written materials to reporters, spoke to the media, and made copies of the Munyan videotape available to the media. In addition, in a separate count of his complaint, Cooke alleged that all of the defendants conspired or agreed and planned to defame him and, as a result, each should be held liable for the tortious acts of the others.
 {¶ 32} Three factors here convince us that questions of fact preclude summary judgment on Cooke's defamation claim against James. Initially, the evidence, with all inferences drawn in favor of Cooke, suggests James was involved in planning the contents of the press conference. The May 11 and 14, 1998 billing entries from Edward Howard indicate that a tape was picked up and then returned to James. The May 18, 1998 entry reflects a meeting with James and Gillan, as well as others, to discuss "next steps." On May 21, 1998, entries state, "[n]ews conference prep/review Cheadle filing/discuss w/L. James," and "review Larry James' Chealdle-filing [sic] and offer message points to WRH." Colleen Cheadle was James' client and a former UDF manager, and it is undisputed that James answered questions about Cheadle at the press conference. The June 3, 1998 entry notes, "[c]omplete work on press conference plans and materials; discussions w/J. Kompa, B. Gillan, L. James," and an invoice for that date states "news conference phone discussions with B. Gillan and L. James."
 {¶ 33} Billing records for the time period after the press conference indicate James was involved in post-press conference strategy. For example, the entry for June 5, 1998 indicates, "[f]ollow-up to news conference — monitor news casts, arrangements for interview programs, reporter contacts, discussions w/L. James, B. Gillan." Similarly, the June 8, 1998 entry states, "continuing follow-up to news conference and related activities — strategy discussions w/B. Gillan, L. James," and the June 9, 1998 entry notes, "[d]raft response re: Cooke news release of `bogus' tape; plan activities with B. Gillan, L. James." Entries on June 11, 13, and 14 all reflect arrangements involving James, including a tape pick-up from James and draft of "dirs./room info for Brian and Larry James."
 {¶ 34} While the foregoing entries do not compel a jury to conclude James was involved in planning the press conference, they allow such an inference. James was present in the meetings as legal counsel. From that a jury properly could conclude that the entries reflecting discussion of the upcoming press conference would include at least a general discussion of the content to be presented, because James' presence suggests a discussion concerning the legal aspects of the press conference and its content.
 {¶ 35} Secondly, James' participation in the press conference itself implies a common understanding or design. Whether or not James knew in advance that he would be involved in the conference, he participated in it after having participated in the pre-conference discussions noted above. His single repudiation of the general thrust of the conference, through his statement that he was not accusing Cooke of anything, is a factor the jury may consider in determining the degree to which James had a common understanding of the plan for the press conference.
 {¶ 36} Lastly, the document James filed in federal court the morning before the press conference contained virtually the same allegations against Cooke that arose out of the press conference. The motion for sanctions states in pertinent part that "Munyan admits on the tape that she agreed to testify falsely for Plaintiff and Cooke in exchange for sharing the money Plaintiff and Cooke believed they would receive from Defendants." As noted, the press conference materials stated in pertinent part that "Munyan admits on the tape that she agreed to testify falsely for Michael and Maudie Williams and Cooke. In exchange for her testimony, Munyan was to receive a percentage of the money that Williams' mother and Cooke anticipated receiving in an out-of-court settlement by UDF." Cooke argues the similarity of language is even more remarkable in view of the fact that Munyan never actually made such an admission on the Munyan videotape.
 {¶ 37} Cooke's argument is persuasive. Without question, James is protected from a defamation claim for the contents of the documents filed in the court proceedings, and Cooke does not seek to hold James liable for the contents of the court document. Moreover, the similarity between the court document and the press conference content is not enough in itself to allow an inference of a common understanding sufficient to prevent summary judgment for James. Nonetheless, James' participation in pre-conference discussions, combined with his filing the court document and his presence at the press conference, suggests James was aware of the substance of the press conference, agreed to the common understanding, filed a document in court reflecting the common understanding, and participated in the conference with that understanding.
 {¶ 38} We readily acknowledge that our determination of Cooke's assignment of error does not indicate Cooke ultimately will prevail. Rather, we determine only that the facts the parties presented create a genuine issue of material fact for the jury to resolve.
 {¶ 39} Cooke next argues that James' own statement at the press conference that he had an obligation to report Cooke to the disciplinary counsel was not a protected statement of opinion, and therefore summary judgment was unwarranted.
 {¶ 40} The Ohio Supreme Court has determined that the Ohio Constitution supplies a separate and independent protection for opinions, and is not limited in its application to allegedly defamatory statements made by media defendants. Wampler v. Higgins (2001),93 Ohio St.3d 111, syllabus. Thus, nonmedia defendants, such as James, may invoke this protection for opinions. Id. at 112. The determination of whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. Vail v. The Plain Dealer Publishing Co. (1995), 72 Ohio St.3d 279, 280, citing Scott v. News-Herald (1986),25 Ohio St.3d 243, 250.
 {¶ 41} "When determining whether speech is protected opinion a court must consider the totality of the circumstances. Specifically, a court should consider: the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." Vail, paragraph one of the syllabus.
 {¶ 42} Applying this test, we note that James spoke in terms of an "obligation" to turn the matter over to the disciplinary counsel. In many situations, whether an individual has a legal or ethical obligation is verifiable in the sense that certain legal or ethical standards exist, but whether a particular individual believes that he has such an obligation under a given set of circumstances is much less verifiable. The general context of the statement was a response to a reporter's question concerning the conduct of Cooke. Before making the "obligation" comment, James first responded, "I'm not going to get into that. He's been practicing law for a long time." The broader context of the statement was the press conference in which UDF was defending itself in the media against claims of racial discrimination, and accusing Cooke of orchestrating a campaign based on fabrications. Under the totality of the circumstances, we conclude that the language James used was value laden and represented a subjective viewpoint.
 {¶ 43} We note that in Cooke's own deposition, he characterized James' statement in the following way: "I am aware that he lent his credibility and standing to this event, and I am aware that he offered in his professional capacity the statement that in his professional opinion he was required to report me to the Bar." (Cooke Depo., at 193.) Thus, James' statement would be understood by the ordinary listener as the professional opinion of an attorney that he had a legal obligation to report Cooke to the disciplinary counsel. Ultimately, whether Cooke had or had not committed an ethical violation was not for James to decide, and at the press conference, James never offered his opinion or accused Cooke of an ethical violation. While the "disciplinary" statement was constitutionally protected, for the reasons noted the trial court nonetheless erred in granting summary judgment in favor of James.
 {¶ 44} In his second assignment of error, Cooke contends the trial court erred in ordering certain documents sealed. Cooke contends that the agreed confidentiality order only prohibited him from using certain documents outside the proceeding and made no provision for the sealing of any documents. Thus, he contends the order sealing the documents was erroneous.
 {¶ 45} The terms of the confidentiality order, in pertinent part, were as follows:
 {¶ 46} "During the course of discovery in this matter, Cooke requested Edward Howard Company (`EH C') to produce certain documents that were a result of communications between it and defendant United Dairy Farmers, Inc. (`UDF')[.] * * * [T]he parties herein agree that the parties and/or their counsel herein shall hereby be precluded from using, showing, disclosing, disseminating, or otherwise revealing the contents of any such documents outside of the proceedings herein."
 {¶ 47} Defendants UDF and Gillan filed the motion to have the documents placed under seal, they are not parties to this appeal, and their case remains pending before the trial court. Defendants James and Crabbe, Brown were not parties to the motion to seal, and they are the only parties opposing this appeal. Accordingly, the second assignment of error is not properly before this court at this time, and any decision by this court at this time without giving UDF and Gillan an opportunity to be heard would be prejudicial to their interests. The second assignment of error is, therefore, overruled.
 {¶ 48} Based on the foregoing, Cooke's first assignment of error is sustained in part and overruled in part, his second assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is reversed.
Judgment reversed.
BOWMAN and BRYANT, JJ., concur.
LAZARUS, J., dissents.