[Cite as *Moylan v. Owens Community College*, 2009-Ohio-7020.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

THOMAS J. MOYLAN

     Plaintiff

     v.

OWENS COMMUNITY COLLEGE

     Defendant
     Case No. 2006-01734

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff brought this action alleging wrongful discharge in violation of public policy, violations of his rights to due process, defamation, and intentional infliction of emotional distress.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} From October 2001 to October 2005, plaintiff was employed by defendant, Owens Community College (OCC), as manager of the campus bookstore. This case arises as a result of an incident that occurred on September 29, 2005, when plaintiff allegedly slapped Rebecca Drayton, the assistant manager of the bookstore. Drayton did not immediately report the matter to any of OCC's upper management staff, but she attempted to contact Julee Cope, OCC's chief of security, with whom she had worked on previous occasions regarding theft occurring at the bookstore. Because Cope was away at a conference, Drayton did not meet with her until October 10, 2005. Drayton

---

[1]Prior to trial, plaintiff filed a notice of dismissal of his claim of malicious prosecution.

and Cope reviewed surveillance videotapes from the date of the incident and located a portion of the tape that depicted plaintiff's right arm extended toward the left side of Drayton's face. Cope informed Drayton that incidents of such a nature required that a written report be made; Drayton completed a report that same day. Cope then compiled a security report of the matter (Plaintiff's Exhibits 1 and 28) and contacted her supervisor, David Basich, OCC's associate vice president of business affairs. Cope attempted to reach Drayton's supervisor, David Winckowski, administrator of auxiliary services; however, he was not at work that day. Cope then contacted Winckowski's supervisor, Chris Bauerschmidt, the director of business services.

{¶ 3} After the security report was disseminated, a meeting was convened with Cope, Basich, Bauerschmidt, and Eugene Lapko, the vice president of human resources. The minutes of the meeting (Plaintiff's Exhibit 3) state that the security report and videotape were reviewed and that Drayton was then called to join the meeting. Drayton related her version of how the incident occurred. Although not reflected in the minutes, Drayton testified that she explained at the meeting that she and plaintiff were discussing an e-mail that plaintiff had sent to her requesting that she complete a particular assignment; that she had expressed that she was too busy to accomplish the assignment at the time; that plaintiff had remarked to her that he had nothing to do; that in response she had sarcastically replied "obviously," and that plaintiff had then slapped her. At the meeting, Drayton was asked to demonstrate the force of the slap on Lapko's hand; she related that the contact was hard enough to cause a stinging sensation. Drayton also revealed that on a previous occasion plaintiff had grabbed her face and squeezed her cheeks inward in reaction to a remark she had made. Drayton admitted that she had never reported that incident, but stated that she had told plaintiff never to touch her again.

{¶ 4} When plaintiff arrived at work on October 11, 2005, he was summoned to a meeting with Lapko, Bauerschmidt, and Winckowski. According to the minutes from that meeting (Plaintiff's Exhibit 3), plaintiff was noticeably distraught and began clutching at his chest, but regained his composure and was able to continue with the meeting. Lapko asked plaintiff a series of questions, beginning with general inquiries

and leading to more specific requests for information. For example, plaintiff was asked whether he had ever slapped or physically touched any employee, then was later asked if he recalled any incident when he had slapped Drayton, or if he recalled an incident during which he had grabbed Drayton's face. The minutes reflect that plaintiff stated "I do not remember, sir" to each of Lapko's questions. Plaintiff was then shown the surveillance tape, whereupon he stated that he did not remember the incident but related that, if he had touched Drayton, he had done so in a "familiar manner." Lapko informed plaintiff that effective immediately he would be suspended without pay pending further investigation of the matter.

{¶ 5} On October 25, 2005, Lapko sent a letter to plaintiff advising him that his indefinite suspension would continue pending completion of the investigation, and explaining that plaintiff would be notified when a final employment decision had been reached. (Plaintiff's Exhibit 6.) The letter listed the following reasons for the suspension: 1) sustaining a climate of intimidation; 2) touching/hitting a co-worker in violation of R.C. 2903.13;[2] and 3) violation of OCC's position against workplace violence.

{¶ 6} On or about November 1, 2005, plaintiff contacted Winckowski and asked about the status of his employment. Winckowski referred plaintiff to the Department of Human Resources. Plaintiff then attempted to reach Lapko but was not successful. Thereafter, plaintiff sent an e-mail to Winckowski, Bauerschmidt, Lapko and other OCC staff (Plaintiff's Exhibit 7), wherein he referenced the OCC's Harassment Policy 3358:11-4-02,[3] and stated that, pursuant to that policy he was entitled to a complete investigation and an opportunity to respond, and that neither had occurred. He also stated that, after the October 11, 2005 meeting, he had made three telephone calls in an effort to resolve the issues surrounding his suspension, but that none of those calls

---

[2]R.C. 2903.13 provides that:

"(A) No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn.
"(B) No person shall recklessly cause serious physical harm to another or to another's unborn.
[3]The policy provides in pertinent part that OCC "does not and will not tolerate harassment of its employees or students. The college recognizes all employees should be able to work in security and dignity and should not have to endure insulting, degrading or objectionable treatment." Section (D) of the policy provides that "[b]oth the person(s) claiming harassment and accused have a right to a prompt and complete investigation of the claim, as well as the result of the investigation." (Defendant's Exhibit J.)

had elicited a response. Plaintiff further stated: "[a]gain, I reiterate (as I did on October 11, 2005) my complete innocence in this matter."

**{¶ 7}** On December 2, 2005, Lapko sent plaintiff a letter notifying him that OCC had recommended his termination to the Board of Trustees, with an effective date of November 16, 2005. (Plaintiff's Exhibit 9.) The recommendation was accepted at a December 13, 2005 meeting of the board, and plaintiff was notified of the same by letter dated December 14, 2005. (Plaintiff's Exhibit 10.) In both the December 2 and 14 letters the stated reasons for the termination were that plaintiff's "actions on September 29, 2005, (verified by surveillance videotape) violated the College's policy against workplace violence and/or R.C. 2903.13-Assault." The allegation that plaintiff had sustained "a climate of intimidation" was not pursued due to a lack of evidence regarding the incident in which he had allegedly touched Drayton's face on a previous occasion.

**{¶ 8}** The threshold issue in this case is whether the evidence supports a finding that plaintiff struck Drayton. In addition to the testimony of the lay witnesses, the court has viewed the surveillance tape (Plaintiff's Exhibit 2), individual still frames taken from the tape (Plaintiff's Exhibits 40-41, Defendant's Exhibit H), and has considered the testimony of plaintiff's experts, Jeff Strzesynski, a private investigator and former Maumee police officer who provided his analysis of the tape, and Stephen Coleman, an audio-video multimedia specialist.

**{¶ 9}** At the time of the incident, plaintiff and Drayton were standing across from one another at a work counter, looking at several documents that lay between them. Although it was not stated in the October 10, 2005 meeting minutes, Drayton testified that she described the incident as three quick slaps; the first to her left cheek, followed by a return slap on her right cheek, then a second slap to her left cheek. The minutes of the October 11, 2005 meeting reflect that plaintiff was questioned as to whether he recalled slapping Drayton three times. There is no question that a segment of the tape shows plaintiff's left arm extended toward Drayton, above her right shoulder with plaintiff's left hand obscured by the right side of her face. However, the tape in use at the time did not record continuously, rather, it captured a series of one-frame-per-second shots with a .96 second lapse between frames. Because of the delay between

frames, it is not evident whether plaintiff's hand made contact with Drayton's face. Neither of plaintiff's expert's could state with certainty that there was any such contact. However, both experts acknowledged that Drayton's head and upper body moved back and her face moved in the direction of the alleged first slap. The tape shows that after the confrontation, Drayton did not move from the counter where she and plaintiff were standing but continued to look down at the counter as she had prior to the confrontation.

{¶ 10} Plaintiff insists that he did not strike Drayton. There was no evidence that he had a history of aggressive or inappropriate conduct with employees, or that he had ever been disciplined for any reason. The parties stipulated at trial that plaintiff had consistently received positive job performance evaluations. However, there was testimony that plaintiff and Drayton had conflicting management styles that occasionally resulted in disagreements between them. The testimony was consistent that plaintiff tended to be quiet and kept to himself, whereas Drayton was more of a "people person." With respect to the incident itself, plaintiff testified that his statement at the October 11, 2005 meeting that he may have touched Drayton in a "familiar manner" had not accurately conveyed what he had intended. He explained that he frequently used hand gestures when speaking and that, in the frame from the surveillance tape that depicts his arm extended toward Drayton's face, he may have been pointing to something over Drayton's shoulder, or using his hand to emphasize a point he was trying to make in his conversation with her. Plaintiff further testified that he was in "complete shock" when he went into the October 11, 2005 meeting, that he had responded to Lapko's questions in the same manner in which they were asked, such that when questioned as to whether he recalled certain incidents, he had simply replied that he did not recall and that he had not "suddenly remembered" what happened when he was shown the surveillance tape. He further related that he had been employed at OCC for four years and felt that he had established his credibility, but that he was treated as if he had already been found guilty.

{¶ 11} Drayton testified unequivocally that plaintiff had indeed slapped her three times. She testified that she did not react defensively to the incident as might be expected, but that she was stunned and in shock. She explained that she continued to look down at the counter but that she was no longer participating in conversation with plaintiff. Drayton further related that there were several student employees in the area

at the time but that their backs were turned and, because of the loud music playing in the store, she thought they had not heard or seen the incident. According to Drayton, the management conflicts between her and plaintiff had caused him to warn her that she should look for other employment because he thought she wanted to take the store in a different direction than he did. Drayton testified that she waited to report the incident until Cope returned to work because Cope was the chief of security and she felt most comfortable with her. She further testified that she was afraid she would not be believed and that she wanted to view the surveillance tape with Cope so that she would have evidence to support her allegations.

{¶ 12} Upon consideration, the court finds that the totality of the evidence demonstrates that plaintiff struck Drayton. The court is persuaded by the testimony that, although plaintiff otherwise had an exemplary work record with OCC, he had difficulty dealing with stress and lacked skill in relating directly with other employees. Moreover, the court found the testimony of Drayton to be more credible than that of plaintiff with regard to the incident and what was depicted on the surveillance tape. Cope, Winckowski, Bauerschmidt, Basich, and Lapko all reviewed the tape and each testified that they believed that what they observed was plaintiff striking Drayton. There is no question that OCC had a policy of zero-tolerance for violence and that plaintiff was aware of the policy. As explained by Basich, the policy was enforced regardless of the amount of force used. Consequently, although several witnesses testified that they did not believe plaintiff struck Drayton maliciously, the policy had to be enforced.

{¶ 13} Upon review of the evidence, testimony, and post-trial memoranda of counsel, the court makes the following determination with regard to plaintiff's claims.

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

{¶ 14} As recognized by the Supreme Court of Ohio in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Id. at 234.

{¶ 15} The issue whether an employment termination violates public policy must be analyzed according to a four-prong test which balances the justification for the

termination against the effect it will have upon the public policy. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 1997-Ohio-219. The court must determine whether: 1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); 3) the dismissal was motivated by conduct related to the public policy (the causation element); and 4) the employer lacked an overriding, legitimate business justification for the dismissal (the overriding justification element). Id.

{¶ 16} Although plaintiff contends that he was wrongfully discharged in violation of public policy, he acknowledges that he was employed pursuant to a contract. As such, the public policy exception does not apply and the claim fails on that basis. However, even assuming that the exception was applicable, the court's finding that plaintiff struck Drayton constitutes an overriding, legitimate business justification for his discharge that also defeats this claim.

**BREACH OF CONTRACT**

{¶ 17} Plaintiff argues for the first time in his post-trial brief that his termination constitutes a breach of his employment contract with OCC. Specifically, plaintiff contends that he had a contract of employment for the term of July 1, 2004 through June 30, 2006 (Plaintiff's Exhibit 16); that the contract was conditioned upon satisfactory performance and compliance with all OCC rules, regulations, and policies; that there is no credible evidence to suggest that plaintiff's work performance was ever less than satisfactory or that he violated any applicable rules; and that, therefore, he had a legitimate claim of entitlement to continued employment. Plaintiff thus construes his employment agreement as a subjective satisfaction contract which required that OCC act in good faith in terminating his employment. See, e.g., *Knowles v. Ohio State University*, Franklin App. Nos. 05AP-727, 05AP-739, 2006-Ohio-6732.

{¶ 18} Contrary to plaintiff's arguments, the weight of the evidence demonstrates that plaintiff violated OCC's rules in that he struck Drayton. Such conduct was both a violation of the policy against workplace violence and a sufficient basis for

dissatisfaction with plaintiff's performance; either of which constituted sufficient grounds to terminate plaintiff's employment. The court further finds that OCC's management staff acted in good faith in investigating the incident and in concluding that plaintiff's performance was unsatisfactory. Although plaintiff argues at length that the investigation was inadequate, the evidence proves otherwise. Moreover, regardless of whether the tape precisely reflects what occurred, or whether more witnesses could have been interviewed or whether a more elaborate investigation file could have been created, OCC staff ultimately had to choose to believe either plaintiff or Drayton. The court is convinced that a sufficient investigation was conducted and that the staff members involved in the process and in the discharge decision were fair and unbiased. Accordingly, the court concludes that plaintiff failed to demonstrate that OCC breached his contract of employment.

**VIOLATION OF DUE PROCESS**

{¶ 19} To the extent that plaintiff alleges violations of his due process rights under the Ohio Constitution and the United States Constitution as set forth in Sections 1983 and 1985, Title 42, U.S.Code, this court lacks jurisdiction to determine such issues. *Graham v. Ohio Bd. of Bar Examiners* (1994)*,* 98 Ohio App.3d 620, 622.

{¶ 20} However, plaintiff also contends that OCC violated its own policies and procedures in failing to provide him with notice and an opportunity for hearing. Other than the right to a prompt and complete investigation as set forth in OCC's Harassment Policy, the only due process to which plaintiff was entitled was through the OCC employee grievance procedures; he was not a classified civil servant, he was not a subject to a collective bargaining agreement, and there were no provisions in his employment contract that required a termination hearing. Plaintiff failed to avail himself of the grievance process.

{¶ 21} OCC's Grievance Policy 3358:11-5-06 (Plaintiff's Exhibit 8), provides at section (C)(1) that the process begins with an "informal grievance" and "must be initiated in writing within ten days of the alleged violation of employee rights." The policy further provides that a grievant is required to "first discuss his/her problem or grievance on an informal basis with the supervisor closest to the origin of the problem." If the

grievance is not resolved with that individual, the grievant is required to "continue informal discussion with line supervisors up to, but not including the president."

{¶ 22} In plaintiff's case, he would have had to contact Winckowski, his immediate supervisor, within ten days of his suspension on October 11, 2005. The first contact plaintiff made with Winckowski was on November 1, 2005, when he made a telephone call to inquire about the status of his employment. Such date was not only more than ten days after the suspension but, in addition, plaintiff failed to say that he wished to initiate the grievance process. In his first written communication by e-mail later that day, plaintiff copied each of the supervisors in his chain of command but, other than maintaining his innocence and stating that "I am the accused with no voice for three weeks," he failed to indicate that he wanted to file a grievance regarding his suspension. Although plaintiff argued that he did not do so because the investigation was under way and that he felt he would ultimately be cleared, the court finds such argument to be disingenuous. Common sense dictates that an indefinite suspension without pay for a person who alleges that he is unjustly accused would be a sufficient reason for filing a grievance. According to the grievance process, the next step after failure to resolve the matter at the informal level is to initiate the formal stage of the process. Plaintiff admitted that he never made any effort to initiate that stage of the process. Moreover, if plaintiff believed that he was being denied access to the grievance process, that in itself would be a reason for initiating the process. Thus, the court concludes that plaintiff failed to prove that defendant denied him due process in terminating his employment.

**DEFAMATION**

{¶ 23} Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame or disgrace, or affecting the person adversely in his or her trade or business. *Sweitzer v. Outlet Communications, Inc.* (1999), 133 Ohio App.3d 102, 108, citing *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136.

{¶ 24} To prevail on a defamation claim, whether libel or slander, a plaintiff must prove the following elements: (1) a false statement, (2) about the plaintiff, (3) published

without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) that was either defamatory per se or caused special harm to the plaintiff. *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 206.

{¶ 25} Truth is an absolute defense against a claim of defamation. *Shifflet v. Thomson Newspapers (Ohio), Inc.* (1982), 69 Ohio St.2d 179, 183.

{¶ 26} Plaintiff contends that the publication of the Board of Trustees December 13, 2005 minutes (Plaintiff's Exhibit 14), wherein they approved the recommendation that plaintiff's employment be terminated, was defamatory to him in that it represented that his termination was "for cause."[4] Plaintiff argues that the statement is untrue because there was no just cause for his discharge nor was there an adequate investigation of the matter upon which to base a finding of just cause. Given the court's previous findings, these arguments are to no avail. Even with the words "just cause" included, the resolution is a true and accurate statement of the board's action. Moreover, plaintiff presented no evidence that could reasonably be construed to demonstrate that the publication caused injury to his reputation, that it exposed him to public shame or disgrace, or that it affected him adversely in obtaining other comparable employment. Accordingly, plaintiff's defamation claim must fail.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

{¶ 27} In order to prevail on a claim of infliction of emotional distress, plaintiff must show that: "(1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious." *Hanly v. Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73, 82, citing *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34.

{¶ 28} To constitute conduct sufficient to give rise to a claim of intentional infliction of emotional distress, the conduct must be "so outrageous in character, and so

---

[4]The resolution states: "BE IT HEREBY RESOLVED that the recommendation of the President to accept the termination of [plaintiff] Manager, Bookstore (Toledo Campus), effective November 16, 2005, for cause, be approved by the Board of Trustees."

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters* (1983), 6 Ohio St.3d 369, 375, quoting 1 Restatement of the Law 2d, Torts (1965) 73, Section 46, Comment d.

{¶ 29} Plaintiff contends that he has experienced extreme emotional distress as a result of the manner in which his employment was terminated, including the lack of an adequate investigation; the failure to respond to his phone calls; and the fact that one of his supervisors had once assured him that, prior to the September 29, 2005 incident, his employment would continue. Plaintiff further argues that OCC management knew that such stress was likely to occur because his physical manifestation of stress had been observed at the October 11, 2005 meeting.

{¶ 30} The court has previously described the steps that were taken prior to plaintiff's discharge. The court has found that the investigation was adequate and that OCC management-level staff acted in a fair and unbiased manner in terminating plaintiff's employment. The court concludes that no action on the part of OCC staff can be deemed to constitute the type of conduct contemplated by case law. Therefore, plaintiff's claim of intentional infliction of emotional distress must fail.

{¶ 31} For the foregoing reasons, the court finds that plaintiff failed to prove each of his claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

THOMAS J. MOYLAN

Plaintiff

v.

OWENS COMMUNITY COLLEGE

    Defendant

    Case No. 2006-01734

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

      This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Kyle A. Silvers
3030 W. Sylvania Avenue, Suite 106
Toledo, Ohio 43613

Velda K. Hofacker Carr
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

LH/cmd
Filed November 6, 2009
To S.C. reporter December 29, 2009