OPINION
{¶ 1} Plaintiffs-appellants Robert E. Murray and The Ohio Valley Coal Company ("TOVCC") appeal the grant of summary judgment entered by the Belmont County Common Pleas Court in favor of defendants-appellees Knight-Ridder, Inc., KnightRidder.com, Inc., the Beacon Journal Publishing Company, Margaret L. Newkirk, John Dotson, Jr., and Janet C. Leach. Appellants allege that the court improperly granted summary judgment on their defamation claims. For the following reasons, the judgment of the trial court is reversed and this case is remanded for further proceedings.
 STATEMENT OF THE FACTS {¶ 2} From January 7, 2001 through January 10, 2001, the Akron Beacon Journal published a series of articles entitled "Power to Pollute." Both parties agree that the purpose of the series was to explore "why Ohio had more air pollution than most other states, and why Ohio utilities were being subjected to lawsuits brought by the United States Department of Justice that claimed the utility companies had illegally kept old, dirty power plants running long past their original life spans in an alleged effort to avoid some of the requirements of the U.S. Clean Air Act of 1970 and its later amendments."
 {¶ 3} While researching one of the stories planned for the series, appellee Newkirk, a reporter for the Beacon Journal Publishing Company, heard the name of appellant Murray in relation to an Ohio tax credit for the purchase of coal extracted in Ohio. She found out that appellant Murray is well-known in the coal mining industry as a successful businessman and resounding voice for the coal community. Therefore, in September of 2000, appellee Newkirk set up an interview with appellant Murray to discuss the tax credit and various other topics.
 {¶ 4} After the interview, appellee Newkirk decided to write a profile piece on appellant Murray for possible publication with the series. In furtherance of this endeavor, appellee Newkirk interviewed various people who do business with, or are competitors of, appellant Murray.
 {¶ 5} On January 9, 2001 (day three of the "Power to Pollute" series) the paper ran an article about appellant Murray, titled "Mine Owner Isn't the Shy, Quiet Type." On January 25, 2001, appellants filed an action alleging that the article contains numerous defamatory statements that have and will cause both personal and economic damages. According to the lawsuit, the alleged defamatory statements are: "The only thing I want is a long line at my funeral. I'm sick. I bought my cemetery plot."; "If the Boich brothers were the quiet voice of coal in the 1990's, `Honest Bob' Murray — as his competitors jokingly call him — was the loud one."; "Even his friends roll their eyes at his hyperbole."; and "Or former coal lobbyist Neal Tostenson: `He tends to exaggerate a good bit.'"
 {¶ 6} Appellants initially named the following defendants in the suit: Knight-Ridder, Inc., P. Anthony Ridder, John L. Dotson, Jr., Janet C. Leach, James N. Crutchfield, and Margaret Newkirk. In September 2001, appellants amended their complaint to remove defendant Crutchfield and add defendants-appellees KnightRidder.com, Inc. and the Beacon Journal Publishing Company. In April of 2001, appellee Knight-Ridder, Inc. and defendant P. Anthony Ridder moved for summary judgment on the grounds that they were not proper defendants. In July of 2001, summary judgment was granted to defendant P. Anthony Ridder and he was dismissed without prejudice. The summary judgment motion submitted by appellee Knight-Ridder, Inc. was continued.
 {¶ 7} On January 15, 2002, the remaining defendants-appellees filed a motion for summary judgment or, alternatively, partial summary judgment. The trial court granted the motion in its entirety on August 9, 2002 in a sixty-eight page judgment entry, and the case was dismissed. Appellants timely appealed the trial court's decision, raising one assignment of error. In that sole assignment of error, appellants take issue with respect to only four sentences in the article. Appellees in turn filed three cross-assignments of error.
 ASSIGNMENT OF ERROR {¶ 8} In their sole assignment of error, appellants contend:
 {¶ 9} "The court of common pleas erred in granting summary judgment to defendants-appellees with respect to four of the statements alleged by plaintiffs-appellants to constitute actionable defamation because plaintiffs-appellants presented sufficient evidence to withstand summary judgment on each element required to establish a claim for defamation."
 {¶ 10} We begin our analysis with the relevant Civil Rule concerning summary judgment which states that:
 {¶ 11} "Summary judgment shall be rendered * * * if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the actions, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *." Civ.R. 56(C).
 {¶ 12} From the plethora of cases that have examined that rule, it is well settled that the party moving for summary judgment has the initial burden to identify those portions of the record that demonstrate the absence of genuine issues of material fact. Dresher v. Burt (1996),75 Ohio St.3d 280, 293. Moreover, should the moving party meet that initial burden, the nonmoving party then bears a reciprocal burden of setting out specific instances of genuine issue of material fact which merit a trial. Id. All evidence in a motion for summary judgment must be construed in the light most favorable to the nonmoving party. Miller v.Bike Athletic Co. (1998), 80 Ohio St.3d 607, 617, citing Civ.R. 56(C). Finally, when presented with the trial court's grant of summary judgment on appeal, this court reviews the decision de novo. Wampler v. Higgins
(2001), 93 Ohio St.3d 111, 127.
 {¶ 13} A defamatory statement is a false statement that: causes injury to a person's reputation; exposes him to public hatred, contempt, ridicule, shame, or disgrace; or affects him adversely in his trade or business. Matalka v. Lagemann (1985), 21 Ohio App.3d 134, 136. In a libel claim, the plaintiff must establish that: (1) a false statement of fact was made concerning the plaintiff, (2) the statement was defamatory, (3) the statement was written, (4) the statement was published, and (5) the defendant acted with the requisite degree of fault in the publishing.Bruss v. Vindicator Printing Co. (1996), 109 Ohio App.3d 396, 399.
 {¶ 14} To survive a motion for summary judgment in a defamation action, a plaintiff must make a sufficient showing as to each of the five essential elements of the case. Sethi v. WFMJ Television, Inc., (1999)134 Ohio App.3d 796, 804, citing Celotex Corp. v. Catrett (1986),477 U.S. 317. Summary judgment is appropriate in defamation actions because the question of whether or not words are defamatory is largely a question of law for the court. Sethi, 134 Ohio App.3d at 804, citing Vailv. Plain Dealer Publishing Co. (1995), 72 Ohio St.3d 279.
 {¶ 15} The Ohio Supreme Court has held that it is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not. Yeager v. Local Union 20, Teamsters
(1983), 6 Ohio St.3d 369, 372. Defamation is divided into the categories of defamation per se and defamation per quod. When a statement is unambiguous, the question of whether it is defamatory per se is a question of law for the court to determine. Gosden v. Louis (1996),116 Ohio App.3d 195, 207.
 {¶ 16} Material that is defamatory on its face is defamation per se. Moore v. P.W. Pub. Co. (1965), 3 Ohio St.2d 183, 188. Material that is not defamatory by itself but becomes so by the use of interpretation or innuendo is defamation per quod. Id. The distinction between defamation per se and per quod is significant, as it determines whether damages must be pled and proven. If a statement is defamatory per se, damages will be presumed and thus need not be pled nor proven. Strussionv. Akron Beacon Journal Publishing Co., 9th Dist. No. 20833, 2002-Ohio-3200, at ¶ 21. But, if a statement is defamatory per quod, the plaintiff must plead and prove special damages. Id. "Special damages are damages of such a nature that they do not follow as a necessary consequence of the injury complained of." Stokes v. Meimaris (1996),111 Ohio App.3d 176, 184.
 {¶ 17} Before the alleged defamatory statement may proceed to trial, the court must also make an initial finding as to whether the statement is one of fact or opinion by examining the totality of the circumstances, as opinion is protected under Section 11, Article I of the Ohio Constitution. See Vail, 72 Ohio St.3d 279, at the syllabus. Additionally, if the alleged defamatory statement is substantially true, it is not actionable as a matter of law due to a lack of the necessary element of falsity. Gupta v. Lima News (2000), 139 Ohio App.3d 538, 544.
 {¶ 18} Finally, the court must determine the plaintiff's classification from among the following categories: private person, public official, public figure, and limited purpose public figure. Tallyv. WHIO TV-7 (1998), 131 Ohio App.3d 164, 169. The classification of the plaintiff is determinative of his or her ultimate burden of proof. Id. Specifically, if the plaintiff is determined to be a public official, public figure or limited purpose public figure, the court must then decide whether the plaintiff has shown evidence of actual malice with convincing clarity. Varanese v. Gall (1988), 35 Ohio St.3d 78, 80.
 ARE THE STATEMENTS DEFAMATORY PER SE OR DEFAMATORY PER QUOD? {¶ 19} We begin our analysis with the statement: "The only thing I want is a long line at my funeral. I'm sick. I bought my cemetery plot." The trial court found this statement was one of fact that is defamatory per quod. The court further found the statement to be true and to be subject to an innocent construction. Appellants argue that the statement was defamatory per se, was false, and was not subject to an innocent construction.
 {¶ 20} In regards to their assertion that the statement is defamation per se, appellants specifically argue that the statement relates to readers that appellant Murray is preparing for his impending death. Appellants claim that such a belief will affect appellant Murray adversely in his business. To determine the validity of this claim it is necessary to examine the nature of appellant Murray's business.
 {¶ 21} This court is persuaded by appellant's argument regarding the effect of the statement, which implies that appellant Murray is dying:
 {¶ 22} "It also causes financial harm because Murray is generally perceived as a `one man operation' for TOVCC and his other companies; consequently, lenders, utility customers, insurers, employees and others who are dependent on the continued successful operation of these companies are impacted and deterred from dealing with [appellants] based on the belief that Murray's life might end in the near future. Without faith and confidence in Murray's continued ability to engage in the day-to-day leadership of his companies, the ability of those companies to maintain and obtain new coal contracts, borrow money from lenders for ongoing operations, growth and acquisitions, purchase insurance and surety bonds necessary for the operation of the companies and hire and keep qualified employees, is jeopardized." Plaintiff's response to motion for summary judgment, ¶ 65-67.
 {¶ 23} According to an organizational chart (Loiacono Depo., Exhibit 160), Murray Energy Corporation is a holding company comprised of the various operating assets. Appellant Murray is the sole shareholder of Murray Energy Corporation. (Murray Depo. 23-24). Furthermore, according to a financial summary for Murray Energy Corporation, the operating assets owned by Murray Energy Corporation are also owned individually by appellant Murray. (Loiacono Depo., Exhibit 160).
 {¶ 24} Those dealing with appellant Murray's various businesses are most likely aware of this ownership structure. Due to this structure, it is quite likely that the death of appellant Murray would disrupt the businesses greatly, a fact in all probability anticipated by those dealing with appellant Murray's businesses.
 {¶ 25} This court also is persuaded by the statements of individuals who have been the second party to various business transactions with appellants, as these statements further evidence how a belief that appellant Murray is dying may have a negative impact on business relationships. Michael Beyer was Vice President of Enron Corporation, who financed an earlier acquisition for appellant Murray and American Coal Company, another of appellant Murray's companies. In regards to appellant Murray and the role he takes in his businesses, Beyer stated:
 {¶ 26} "[W]e entered into our relationship with the American Coal Company because of Bob Murray. * * * [T]he only reason we did that deal was because we felt Bob Murray could accomplish and make those changes. If those changes weren't made, then there was a question about whether there would be sufficient cash flow to service our credit facilities, so it was critical that Bob Murray be able to continue to perform as the driver of the organization * * *." (Beyer Depo. 30-31).
 {¶ 27} Patrick O'Brien is Vice President of Coal for AEP Energy Services, Inc., a customer of appellant Murray. While discussing appellant Murray's role in his businesses, O'Brien stated:
 {¶ 28} "[C]ertainly part of what you are looking for in entering into an agreement is a continuity of ability to perform, and certainly right or wrong, Bob has a reputation of being the man at his companies, and so to that extent * * * I think that is the reputation he has, that's the reputation that precedes him, * * * and if you were going to do business with Mr. Murray, you would want to feel that Mr. Murray was going to be around to fulfill the obligations of the agreement that you are dealing with with [sic] his companies." (O'Brien Depo. 28-29).
 {¶ 29} Ordinarily, defamatory statements that injure a person in his trade or profession are actionable per se. Smith v. Klein (1985),23 Ohio App.3d 146, 148. By indicating that the owner and controller of these various companies is dying, appellees have injured appellant Murray in his business in that other parties will be deterred from dealing with him for fear that he will die and the operations he heads up will subsequently change.
 {¶ 30} The relationship that a business owner maintains with lenders, insurers, and customers involves a reasonable degree of trust and expectation of the continuation of the relationship. The amount of trust required for appellant Murray's unique business transactions is exemplified by the excerpts of depositions of those who deal with his companies. They consider themselves to be dealing with appellant Murray himself. Thus, if those who do business with appellant Murray's companies believe he is dying, they may choose to cease doing business with those companies out of fear that their reason for associating with the company will soon be gone. Accordingly, this statement is defamatory per se. SeeRavnikar v. Bogojavlensky (2003), 438 Mass. 627 (stating that because of the high degree of trust required for a physician-patient relationship, a physician who falsely stated to a potential patient that another physician is dying is liable for defamation).
 {¶ 31} The trial court also found this sentence to be subject to an innocent construction. Under the innocent construction rule, if a statement is capable of both a defamatory and an innocent meaning, the innocent meaning must be adopted and the defamatory one rejected. Sethi,134 Ohio App.3d at 808. If a statement has more than one interpretation, it cannot be defamatory per se. Sullivan v. Tucci (1990),69 Ohio App.3d 20, 22-23 (stating that if an article is susceptible of a non-libelous interpretation, any libelous meaning can only arise by interpretation or innuendo and thus the article is libel per quod). Instead, a statement that has more than one possible meaning is defamatory per quod, as it will require interpretation or innuendo to derive the defamatory meaning, or the non-innocent construction. Thus, it follows that if a statement is defamatory per se, the innocent construction rule cannot be applied, for the thrust of the innocent construction rule is that the statement has more than one interpretation.
 {¶ 32} Regardless, even if the innocent construction rule applied to defamatory per se statements, here there is no possible innocent interpretation of this statement. As aforementioned, the innocent construction rule only protects those statements reasonably susceptible to an innocent construction. Yeager, 6 Ohio St.3d at 372. In applying the rule, a court may not construe the words in an unreasonable manner to give the words an interpretation incompatible with their "natural and obvious" meaning. Id. Appellants urge that these three sentences are incapable of an innocent construction and can only lead the average reader to the conclusion that Murray is near death and making arrangements for his funeral. Appellees, on the other hand, contend that the trial court was correct in holding, "Many people buy cemetery plots. Some are ill, some are fatally ill, and some have no illness whatsoever. To state that someone is sick and has bought his cemetery plot is not necessarily defamatory because an innocent construction is possible." J.E. at 43. This court is inclined to agree with appellants' argument.
 {¶ 33} The natural and obvious meaning of the words at hand is that appellant Murray is gravely ill, enough so to expect death in the near future. Because this is the only natural and obvious meaning of the words, they cannot be subject to an innocent construction not relating to appellant Murray's allegedly impending death. As discussed above, the meaning of these words will injure appellant Murray in his business and, thus, are defamatory per se. Furthermore, it does not look as if it is subject to an innocent construction. For the aforementioned reasons, this portion of the appeal has merit.
 {¶ 34} Because each of the remaining statements attack appellant Murray's integrity, this court will now examine all three statements together in order to determine whether each statement is defamatory per se or per quod. The first of the remaining three statements is: "If the Boich Brothers were the quiet voice of coal in the 1990's, `Honest Bob' Murray — as his competitors jokingly call him — was the loud one." The trial court determined that the final portion of this sentence, the statement "was the loud one," is constitutionally protected opinion. As that ruling is not in dispute, the focus now remains on the remainder of the sentence. The court ruled that the fact-based remainder of the sentence is not libel per se. Rather, the court found it reasonably capable of a defamatory meaning tending to injure one's reputation only through interpretation or innuendo, when read in context of the Article and Series of Articles. Thus, the court declared it to be defamatory per quod. J.E. at 26.
 {¶ 35} The second of the remaining three statements is: "Even his friends roll their eyes at his hyperbole." The trial court determined that this sentence was portrayed as fact and was not subject to an innocent construction. The trial court also found that the statements are "through interpretation and innuendo, when read in the context of the entire Article and the Series of Articles, are reasonably capable of a defamatory meaning tending to injure one's reputation by lowering him in the estimation of the community or by deterring third persons from associating or dealing with him," are defamatory per quod. J.E. at 46. The court also found this sentence to be substantially true. Id.
 {¶ 36} The last of the remaining three statements is: "Or former coal lobbyist Neal Tostenson: He tends to exaggerate a good bit." The trial court determined that this statement is defamatory per quod and is substantially true. Appellants, on the other hand, assert that the sentence is defamatory per se and is false. Appellants reiterate the assertions voiced for the previous statement. They argue that it gives the impression that appellant Murray has been known to be dishonest in the past. They argue that appellee Newkirk acknowledged that it is tantamount to saying appellant Murray is dishonest. They point out that a journalism expert stated in an affidavit that the reader could only conclude that appellant Murray is a liar.
 {¶ 37} In contrast to the trial court's rulings, appellants argue that these phrases indicate on their faces, without the need to refer to any extraneous evidence, that appellant Murray is a dishonest person and is lacking in integrity. Appellants further argue that the statements on their faces will have a direct impact on Murray's reputation, both in the community and professionally, and are therefore defamatory per se.
 {¶ 38} In Becker v. Toumlin (1956), 165 Ohio St. 549, the Supreme Court defined libel per quod, stating that "[l]ibel per quod may occur where a publication, which, of itself, or per se, is not libelous, becomes so by the use of an innuendo rendering the apparently harmless words into libelous ones by extrinsic evidence or, as is said, aliunde, as distinguished from per se." Id. at 556. "Aliunde" is defined as "from another source; from elsewhere," with the definition referencing the phrase "extrinsic evidence." Black's Law Dictionary (7 Ed.Rev. 1999) 74. To that extent, it has been written that "[t]he terms per se and per quod simply differentiate between statements defamatory on their face and those defamatory solely in light of extrinsic facts." American Jurisprudence 2d (1995) 439, Libel and Slander, Section 134.
 {¶ 39} Therefore, when a publication does not require outside reference to have a defamatory meaning, it is defamation per se. ThomasH. Maloney Sons, Inc. v. E.W. Scripps Co. (1974), 43 Ohio App.2d 105,112-113 (stating that libel per quod is libel achieved by "the use of an innuendo rendering the apparently harmless words into libelous ones by extrinsic evidence."); Wagner v. Shelby County (May 31, 2001), 3d Dist. No. 17-2000-15; Fenley v. Bowman (Apr. 17, 2000), 4th Dist. No. 99CA57;Fenley v. Bowman (Aug. 24, 1998), 4th Dist. No. CA98-02-013. Furthermore, statements that injure a person in his trade or profession are typically actionable per se. Douglas Elec. Corp. v. Grace (1990),70 Ohio App.3d 7, 13.
 {¶ 40} For example, it would be defamatory per se to say "Sue, Tom's wife, had a sexual relationship with Bob," as the statement on its face causes shame and disgrace to Sue. However, the statement that "Sue had a sexual relationship with Bob" is not defamatory per se but only defamatory per quod because extrinsic evidence, or outside knowledge, that Sue is married to Tom would be necessary to establish a defamatory meaning. See Rodney A. Smolla, Law of Defamation, Section 7:20 (2d Ed. 2003).
 {¶ 41} When determining whether an allegedly defamatory statement is in fact defamatory as a matter of law, courts must examine the totality of the circumstances. Belinky v. Drake Ctr., Inc. (1996),117 Ohio App.3d 497, 507. "The statements at issue should be read in the context of the entire article in determining whether a reader would interpret them as defamatory." Mendise v. Plain Dealer Publishing Co.
(1990), 69 Ohio App.3d 721, 726, citing Shellenberger v. ScrippsPublishing Co. (1909), 20 Ohio Dec. 651, affirmed (1912), 85 Ohio St. 492. Thus, the court must consider these three statements in context with each other and with the rest of the article in order to determine whether the statements were defamatory per se.
 {¶ 42} The article titled "Mine owner isn't the shy, quiet type"[1]
paints a destructive picture of appellant Murray. As if to set the tone, the piece begins by relaying to the reader the notion that appellant Murray's competitors jokingly call him "Honest Bob." The article goes on to describe how appellant Murray "was instrumental" in a tax credit that cost the State of Ohio $72 million, how he "railed" the governor for more tax credits, and how he "yells a lot." Appellant Murray is quoted boasting about how the unions' love him, giving the name of a union official to confirm that contention. The union official is quoted as being "mystified" by his inclusion in the conversation. It is further stated that appellant Murray "never lets them forget who's boss." And finally, Murray is said to claim that he will "be the last man standing" in the Ohio coal industry. In the totality of these circumstances, a reader of the three particular statements at issue is likely to believe that appellant Murray is a liar, a despicable character who is willing to do whatever is necessary to get his way in business.
 {¶ 43} Reading the three statements at issue together further supports the notion that appellant Murray is an untruthful person in his business dealings. Each of the statements, that competitors jokingly call appellant Murray "Honest Bob," that his friends roll their eyes at his hyperbole, and that a person experienced in the coal mining field believes that he exaggerates a good bit, all on their own conveys on its face, the idea that appellant Murray lies.
 {¶ 44} The message derived from the fact that one's business rivals jokingly call him honest is that the person is not honest, but rather is a liar. Similarly, if one's friends roll their eyes at his exaggerations, it is understood that the embellishments are pervasive in every aspect of that person's life. And, in a similar vein, if one in the same business as a person declares that the person is prone to overstatements, it is understood that the person is known in the realm of business for not being truthful. Putting all of these ideas together paints a picture of a person known by business competitors and acquaintances and personal friends alike as a liar.
 {¶ 45} Consequently, reading all three statements in light of one another only serves to further reinforce the notion of appellant Murray's dishonesty. No extrinsic evidence is needed to derive the defamatory meaning, as it is evidenced by the very words of the statement themselves. As such, these three statements are, as a matter of law, defamatory per se. This portion of the appeal has merit.
 SUBSTANTIAL TRUTH {¶ 46} Regardless of whether a statement is defamatory per se or per quod, if the statement is substantially true it will not be actionable as a matter of law. Ed Schory Sons, Inc. v. Soc. Natl. Bank
(1996), 75 Ohio St.3d 433, 445. "In Ohio, truth is a complete defense to a claim for defamation." Id. Thus our analysis must now turn to whether the statements are substantially true. "Whether a defamatory statement is substantially true is a question of fact. Cf. Young v. Morning Journal
(1996), 76 Ohio St.3d 627 (summary judgment was improper because there was a question as to whether the report was substantially accurate pursuant to R.C. 2317.05)." Sweitzer v. Outlet Communications, Inc.
(1999), 133 Ohio App.3d 102, 110.
 {¶ 47} After determining that the statement regarding appellant Murray's ill health was defamatory per quod, which as discussed above was in error, the trial court further determined the statement was true and thus not actionable as a matter of law. It should initially be noted that there is some disagreement as to the origins of this group of sentences. Appellants contend that the statement was concocted of two quotes made at different points in the interview and one that was never stated by appellant Murray at all.
 {¶ 48} Appellants maintain that at one point in the interview with appellee Newkirk, appellant Murray commented that he hoped that at the end of his life people were appreciative of the work he has done and will honor him with a long line at his funeral. (Murray Depo. 731). They state that at a separate time in the interview, appellant Murray, in an attempt to demonstrate his ties to Belmont County, told appellee Newkirk, "I'm from Belmont County, this is home, * * * I grew up here, my wife grew up here, our families are buried here and we have even bought our cemetery plot here, this is home." Id. at 639.
 {¶ 49} Appellants further contend that appellant Murray never said that he was sick. Rather, appellants offer that appellant Murray was wearing a neck brace due to recent neck surgery and as a result he could not go underground with appellee Newkirk as he had invited her to do. Id. at 636. He apologized for the fact that he could not open his left hand and that it hurt to open his right hand, so he would have to sit in a certain position for most of the time. Id. Appellant Murray claims that he told appellee Newkirk "I'm a mess," but he clarified in his deposition that he never said "neurologically I'm a mess." Id.
 {¶ 50} Appellees relay a different order of events. Appellee Newkirk alleges that appellant Murray made a statement that he was sick, which was immediately followed by the comment that he bought his cemetery plot "as if for emphasis." Defendant's motion for summary judgment, Appendix 4, Newkirk affidavit, ¶ 22. At another point in the interview, appellee Newkirk claims appellant Murray said "The only thing I want is a long line at my funeral," immediately followed by "I have a plot already. I'm having a stone designed." Id. Appellee Newkirk maintains that she simply combined the two quotes because she found them to be logically related and did not believe combining them would alter the meaning of either statement. Id.
 {¶ 51} Appellees further argue that, regardless of what appellant Murray did or did not state at the interview with appellee Newkirk, the statement is true. Appellees point to appellant Murray's lengthy history of neck and back problems and the surgeries he has had in relation to these injuries. Appellees also express the importance of appellant Murray's previous statements, in both public and private communications, regarding the status of these injuries.
 {¶ 52} This argument is unpersuasive. There is a substantial difference between a disability and dying. People with spine and neck problems do not necessarily die due to the pain and discomfort the injury may burden them with. Just because appellant Murray is not shy about telling people of his back and neck problems does not mean that he has informed those listeners of his impending death.
 {¶ 53} In light of disagreement as to whether the statements were made, how the statements were made, and whether they are true, the trial court erred in granting appellees' motion for summary judgment. Summary judgment should not be granted unless it appears that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Civ.R. 56(c).
 {¶ 54} Possibly in anticipation of such a finding, appellees argue that even if one were to take appellants' version of events, the effect would be the same as what was reported: "I'm a mess * * * I've bought my cemetery plot. * * * The only thing I want is a long line at my funeral." This argument also is unpersuasive, as it takes the quotes out of context and the meaning is substantially altered. Even if a speaker did make certain statements, those statements can be defamatory if quoted out of context in such a way as to change the meaning. See Masson v. New YorkerMagazine, Inc. (1991), 501 U.S. 496, 525. Therefore, it appears that there is not sufficient evidence of truth to warrant summary judgment.
 {¶ 55} As for the statement that "Even his friends roll their eyes at his hyperbole," appellee Newkirk cited two sources for the comment, Neal Tostenson and Babe Erdos. (Newkirk Depo. 396). Tostenson does not recall discussing appellant Murray while speaking with appellee Newkirk for the "Power to Pollute Series." (Tostenson Depo. 8, 60). Erdos' comments are cited as comments from an enemy at one point, and a friend at another. (Newkirk Depo. 395-396). Additionally, appellee Newkirk admits that she did not physically see anyone roll their eyes. Id. at 397-398. The court recognized this, stating that "Newkirk admittedly invented" the statement. J.E. at 47. Therefore, appellants contend, as appellees cannot pinpoint a source for the statement, it must be fabricated and false. Appellees insist the circumstances surrounding the penning of the statement are irrelevant, as it is substantially true; the court summarily held the same.
 {¶ 56} In light of the inaccuracies in the statement, combined with the opposing assertions, it appears impossible for reasonable minds to reach but one conclusion regarding the truth or falsity. See Civ. R. 56(C); Young, 76 Ohio St.3d at 628. Accordingly, the trial court invaded the province of the jury in determining that "the evidence in the record otherwise clearly established that Murray does use `hyperbole' and `exaggeration' as a method of forceful communication."
 {¶ 57} As to the statement "Or former coal lobbyist Neal Tostenson: `He tends to exaggerate a good bit'," appellants argue that the statement was false, and in doing so they again criticize appellee Newkirk's journalistic methods. Most persuasive to appellants in this instance is that Tostenson, the sole source cited by appellee Newkirk for the statement, does not recall discussing appellant Murray with appellee Newkirk at all. (Tostenson Depo. 8, 60).
 {¶ 58} The court recognized this fact, stating that "Whether the statement `he tends to exaggerate a good bit' was, in fact, made by Neal Tostenson (Tostenson has said that he does not remember discussing Murray in his interview with Newkirk) is a question of fact." J.E. at 47. The journal entry then continues on to say that the statement is substantially true regardless of its origins. Id.
 {¶ 59} The truth or falsity of an alleged defamatory statement is a question of fact for the jury. Sweitzer, 133 Ohio App.3d 102; Young,76 Ohio St.3d 627. Considering that the source of the statement does not recall making it while the author insists the comment was made, it appears impossible for reasonable minds to reach but one conclusion as to whether the statement is true. See Civ.R. 56(C); Young,76 Ohio St.3d at 628. Accordingly, the trial court invaded the province of the jury in determining that "the evidence in the record otherwise clearly established that Murray does use `hyperbole' and `exaggeration' as a method of forceful communication." J.E. at 47. This portion of the appeal has merit.
 WERE THE STATEMENTS PUBLISHED WITH ACTUAL MALICE? {¶ 60} There are four possible classes of plaintiffs in defamation cases: private person, public official, public figure, and limited purpose public figure. Tally, 131 Ohio App.3d at 169. Appellants were determined to be limited purpose public figures for this action, a finding they do not take issue with.
 {¶ 61} All public plaintiffs, including public officials, public figures, and limited purpose public figures, are required to prove that the defendant exhibited actual malice in publishing the allegedly defamatory statement in order to recover in an action for defamation.Gilbert v. WNIR 100 FM (2001), 142 Ohio App.3d 725, 735-736.
 {¶ 62} The Supreme Court distinguished actual malice in defamation from common law defamation, explaining:
 {¶ 63} "Actual malice in defamation cases may be demonstrated only by evidence that the defendant published the statement at issue `with knowledge that it was false or with reckless disregard of whether it was false or not.' Such reckless disregard may be established by clear and convincing evidence that the defendant proceeded to publication despite a `high degree of awareness of * * * probable falsity,' or that `the defendant in fact entertained serious doubts as to the truth of his publication.' The United States Supreme Court has emphasized that `reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' The plaintiff must prove the defendant's actual knowledge or reckless disregard for the truth with convincing clarity in order to warrant submission of the cause to the jury. Finally, actual malice is to be measured as of the time of publication."Varanese, 35 Ohio St.3d at 79-80 (internal citations omitted).
 {¶ 64} Therefore, in considering when it is proper to grant a motion for summary judgment against any type of public plaintiff in a libel action, judgment must be entered for the defendant "if the court finds that there is no genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity." Perezv. Scripps-Howard Broadcasting Co. (1988), 35 Ohio St.3d 215, 218; Duplerv. Mansfield Journal Co., Inc. (1980), 64 Ohio St.2d 116, paragraph two of the syllabus; Bukky v. Painseville Tel. Lake Geauga PrintingCo. (1981), 68 Ohio St.2d 45, 47. In making this determination, the court cannot weigh evidence or draw inferences from the facts, as those are functions for the jury and not the judge in ruling on a motion for summary judgment. Condit v. Clermont Cty. Review (1994),93 Ohio App.3d 166, 172, citing Anderson v. Liberty Lobby, Inc. (1986),477 U.S. 242, 255; Perez, 35 Ohio St.3d at 218.
 {¶ 65} It should be noted that in Hutchinson v. Proxmire (1979),443 U.S. 111, the United States Supreme Court stated in dicta that, "The proof of `actual malice' calls a defendant's state of mind into question,New York Times v. Sullivan, 376 U.S. 254 (1964), and does not readily lend itself to summary disposition." Id. at 120, fn. 9. This sentiment has been echoed in some Ohio cases. See Bukky, 68 Ohio St.2d 45; Condit,93 Ohio App.3d 166; Mucci v. Dayton Newspapers, Inc. (1995),71 Ohio Misc.2d 71.
 {¶ 66} When examining the record for actual malice, the focus is on the publisher's attitude toward the truth or falsity of the publication and not the attitude toward the subject of the publication. Perez,35 Ohio St.3d 215, at paragraph two of the syllabus. However, evidence of ill will can be probative of the existence of actual malice. McKimm v.Ohio Elections Comm. (2000), 89 Ohio St.3d 139, 147. Circumstantial evidence of the publisher's actual state of mind, be it either subjective awareness of the probability of falsity or an actual intent to publish falsely, can be used to establish the existence of actual malice. Id. at 147-148.
 {¶ 67} Keeping the above factors in mind, we must turn to the facts of the case sub judice. Appellants first argue that appellee Newkirk either knew or had reason to believe that some information she received from her sources was unreliable or false. However, they can point to no evidence to support that contention. Unless a statement is facially incredible or the publisher has a reason to doubt the reliability of a source, the failure to conduct a further investigation does not rise to the level of actual malice. Varanese, 35 Ohio St.3d at 84. Rather, failure to further investigate amounts to actual malice only when there is a reason to doubt the truth of a statement. See Dale v. Ohio Civ.Serv. Employee Assn. (1981), 57 Ohio St.3d 112, 118, fn. 3.
 {¶ 68} Appellants also argue that appellee Newkirk had a preconceived notion to portray appellant Murray as a dishonest man who lacked integrity. Therefore, appellants argue that appellee Newkirk only investigated and reported on those facts that furthered that goal. As evidence of this, appellants point to appellee Newkirk's failure to interview appellant Murray's family, friends, employees, or customers. However, an article is not libelous simply because it is an unfair, one-sided attack. Perez, 35 Ohio St.3d at 219, quoting Westmoreland v.CBS, Inc. (1984), 601 F. Supp. 66, 68. Thus, all of appellants' arguments of poor and one-sided investigatory work by appellee Newkirk are not probative of the issue of the reckless disregard for the truth that is necessary for a finding of actual malice.
 {¶ 69} Appellants further contend that appellee Newkirk both fabricated quotes and presented quotes out of context in such a way as to change the entire meaning into a defamatory one. Reckless disregard is likely to be found where a publisher fabricates a story. A B-AbellElevator Co., 73 Ohio St.3d at 13. This is not to say that any deliberate alteration of a subject's statement automates a finding of knowledge of falsity. Rather, if the alteration changes the meaning of the subject's statement thus bearing upon its defamatory character, the alteration will be probative of a finding of actual malice. Masson, 501 U.S. 496, paragraph one, section (C) of the syllabus.
 {¶ 70} Appellants point to various portions of the record where there are serious doubts as to the origin of statements written by appellee Newkirk. One such example is the opening line of the article, "* * * `Honest Bob' Murray — as his competitors jokingly call him * * *." Here, the sole purported source of the statement, Scott Kiscaden, indicated that he did tell appellee Newkirk that people in the industry call appellant Murray "Honest Bob." (Kiscaden Depo. 19). However, when asked if he told appellee Newkirk that this name was used jokingly, he responded, "Not jokingly." Id. at 13. Nor did he laugh. Id. Additionally, Kiscaden states that he does not recall hearing any other competitors calling appellant Murray by that name. Id. at 26.
 {¶ 71} While it is apparent that appellee Newkirk took liberties in reporting Kiscaden's words, it does not appear that she fabricated the entire quote. However, by inserting the word "jokingly," appellee Newkirk appears to have taken the comment out of context, connoting sarcasm and implying that appellant Murray is in fact dishonest, as discussed in the section pertaining to whether the statement was defamatory per se or per quod.
 {¶ 72} In Masson, one of the passages at issue consisted of a direct quotation spoken by the subject of the article, with a few lines from the middle portion omitted. The Court held that the difference between the quote with and without the portion omitted from the article was material, may be found by a jury to be defamatory, and was therefore enough evidence to support a finding of deliberate or reckless falsification. Id. at 525. Thus, the manner in which the first sentence of the article originated supports a finding of actual malice. Id. at 525.
 {¶ 73} Appellants also point to the statement "Even his friends roll their eyes at his hyperbole" as another incidence of fabrication. Appellee Newkirk cited two sources as the "friends" referred to in the statement — Neal Tostenson and Babe Erdos. (Newkirk Depo. 396). Tostenson has stated that he has no recollection of speaking about Murray to appellee Newkirk, much less making a statement in conformity with the above statement. (Tostenson Depo. 8, 60).
 {¶ 74} As for Erdos, appellants allege that because Erdos is not a friend of appellant Murray but in fact an enemy by the admissions of both appellant Murray and appellee Newkirk, the statement was wholly created by appellee Newkirk. Furthermore, in relation to the action of rolling one's eyes, appellee Newkirk admits that the interviews she conducted with Erdos were over the phone and she thus did not see him roll his eyes. (Newkirk Depo. 396-398). Erdos further stated that he did not tell appellee Newkirk anything about ever rolling his eyes. (Erdos Depo. 9).
 {¶ 75} Curiously, it is not clear from the record whether Erdos ever told appellee Newkirk anything concerning a predilection by appellant Murray to exaggerate, and Erdos' deposition is inclusive as to whether he believes the statement to be true. At one point, the following colloquy took place:
 {¶ 76} "Q. Have you had any experience with Mr. Murray exaggerating anything?
 {¶ 77} "A. Firsthand, no, sir." (Erdos Depo. 35).
 {¶ 78} However, a few pages later, the following discussion is contained:
 {¶ 79} "Q. Did you have occasion to believe that Mr. Murray overstated some things at times?
 {¶ 80} "A. I would say yes, but I can't give you any examples." Id. at 43.
 {¶ 81} Given the confusion over the origins and validity of the statement, it is possible that a reasonable jury would find the statement was fabricated and thus made with actual malice. See Masson,501 U.S. at 525. Appellants also contend that appellee Newkirk fabricated various other quotes used in the article but not at issue today. In appellants' response to appellees' motion for summary judgment, there are no fewer than eight statements contained in the subject article attributed to appellant Murray which he claims to have never spoken. While those statements are not at issue today, if they were in fact fabricated by appellee Newkirk, the statements would then be probative of the existence of actual malice in the writing and publishing of the article.
 {¶ 82} As previously stated, Neal Tostenson does not recall discussing appellant Murray with appellee Newkirk at all. (Tostenson Depo. 8, 60). Thus, a question arises regarding the statement attributed to Tostenson about appellant Murray's alleged tendency to exaggerate. Viewing the evidence in the light most favorable to the plaintiff, as is required in deciding a motion for summary judgment, the trial court should have assumed that Tostenson was telling the truth and was accurate. In light of such an assumption, it would appear that appellee Newkirk fabricated this quote as well, a fact from which a jury may infer actual malice.
 {¶ 83} Appellants offer as further proof of malice the statement, "The only thing I want is a long line at my funeral. I'm sick. I bought my cemetery plot." As was previously stated, appellants and appellees both agree that the statements from which this quote is constructed were made at different points in time, only to be joined by appellee Newkirk in the process of penning the article. The parties are not in agreement, however, about what exactly was said.
 {¶ 84} Appellants contend that appellant Murray never stated "I'm sick." (Murray Depo. 753). Rather, they claim that he only said that he was "a mess" due to spinal surgery which was limiting his movement at the time. Id. at 636. As for the other two comments, appellants argue that they were taken so grossly out of context that the entire meaning was drastically altered, thus demonstrating actual malice on the part of appellees. Id. at 738-740.
 {¶ 85} Appellees, on the other hand, claim that appellant did make each of these statements, albeit separately. Appellee Newkirk combined the statements because she found them to be related to one another. (Newkirk Depo. 541). Although she acknowledges that the presentation of the statements relates to the reader that all three were made together, appellee Newkirk insists that in combining the statements, the meaning of each was not altered. Id. at 557.
 {¶ 86} However, as was previously discussed, the alteration of the words used and the context in which they were presented drastically altered the effect they would have on the reader, thus enabling them to have a defamatory meaning. Masson, 501 U.S. 496; Moleda v. New York TimesCo. (C.A.D.C., 1994), 22 F.3d 310, 316 (stating a plaintiff mush show that the alterations resulted in "a material change in the meaning conveyed by the statement" in order to show defamation). Furthermore, the fact that it was portrayed as a direct quotation from appellant himself further enforces the credence of the statement. As the Supreme Court stated in Masson:
 {¶ 87} "In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work." 501 U.S. 496.
 {¶ 88} The statement herein involves an intimate subject matter (his health and allegedly impeding death) of which he would be one of the greatest authorities. Making it appear as if it is a direct quotation from appellant further magnifies the negative effects it will have on appellant and his business.
 {¶ 89} As a side note on this point, there also appears to be some confusion regarding the notes appellee Newkirk took during the interviews which formed the basis of her article. She states that if a subject was interviewed in person, she took handwritten notes. (Newkirk Depo. 175). She states that she later entered these notes into her computer, later discarding some of these handwritten notes. Id. at 176. However, she is uncertain as to exactly what was thrown away. Id. at 175. Appellee Newkirk also acknowledges that she later went into the typed notes and added various notes as she found necessary, thus altering the original notes. Id. at 265, 282-283. Therefore, there are questions as to the truth and accuracy of the notes used to formulate the article which, if found to be lacking, could support a finding of actual malice. In regards to the possible fabrication of quotes, there is sufficient evidence from which a reasonable jury could find actual malice.
 {¶ 90} Considering all of the above facts and analysis, we find that there is a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. Accordingly, this portion of the appeal has merit.
 WERE THE STATEMENTS OF AND CONCERNING THE OHIO VALLEY COAL COMPANY? {¶ 91} The court found that none of the defamatory statements in the article were "of and concerning" appellant TOVCC. J.E. at 63. Because a party may not recover for the defamation of another, the court reasoned, appellant TOVCC was barred from making a claim for defamation. Id. Whether a plaintiff was the subject of a defamatory statement turns on whether the receiver of that statement understood the statement to refer to the plaintiff. Gosden, 116 Ohio App.3d at 218. The plaintiff's name does not even need to be mentioned in a statement for that statement to be of and concerning him, so long as the receiver would understand that the plaintiff was being spoken of. Shimola v. Cleveland (1989),65 Ohio App.3d 457, 462.
 {¶ 92} As appellees point out, appellant TOVCC was mentioned by name only once in the article. That sentence reads, "Murray owns the second-largest mine still operating in Ohio, the Powhatan No. 6 mine of the Ohio Valley Coal Co. in Alledonia." The tie between appellant Murray and appellant TOVCC is set at that point. After that introduction, there are various other references to appellant TOVCC in the article, just not by name. The following statements are found in the article after appellant TOVCC is mentioned by name:
 {¶ 93} "The triple tax credit allowed Murray to beat out a competitor from across the Ohio River, Consol Energy.
 {¶ 94} "Murray employs the second-largest number of miners in the state.
 {¶ 95} "He proselytizes his workers monthly * * *.
 {¶ 96} "And he never lets them forget who's boss."
 {¶ 97} Surely no one believes that appellant Murray himself beat out Consol Energy for a contract. Rather, appellant TOVCC beat out Consol Energy. Similarly, appellant Murray does not personally employ miners, but does so through TOVCC and his other companies. Likewise, when appellant Murray speaks to "his workers," be it to "proselytize" or for any other purpose, he is doing so in his capacity as owner of TOVCC and his other businesses. However, as none of the other companies are mentioned by name, the reader may understand the sentences to describe appellant Murray's actions solely in his role as owner of appellant TOVCC.
 {¶ 98} Appellee Newkirk chose to interchange the names of appellant Murray and appellant TOVCC when referring to the coal business she was examining. Therefore, it is possible that the reader may infer any negative images of appellant Murray related by the article onto appellant TOVCC. Insofar as any of the statements in the article that possibly defame appellant Murray, a reasonable jury could conclude from this that the article also referred to appellant TOVCC in a defamatory manner. See Id. Therefore, this portion of the appeal has merit.
 PROPER PARTIES TO THE ACTION {¶ 99} Besides appellee Newkirk, the author of the article, the other appellees in this case include: Knight-Ridder, Inc., KnightRidder.com, Inc., The Beacon Journal Publishing Company, Beacon Journal president and publisher John L. Dotson, Jr., and Beacon Journal editor Janet C. Leach. Appellee Knight-Ridder, Inc. had previously filed for summary judgment in concert with P. Anthony Ridder. That motion was granted as to Ridder, but continued as to appellee Knight-Ridder, Inc. Sometime afterward, appellees collectively filed the motion for summary judgment which was granted in the August 9, 2002 judgment entry.
 {¶ 100} In granting summary judgment, the trial court stated early on in the lengthy judgment entry that the motion was sustained and the case dismissed. Shortly thereafter, in the additional pages intended to "establish an appropriate record for Appellate Court review," the trial court asserts that "* * * Defendants, Anthony P. (sic) Ridder, Knight-Ridder, Inc., Knight-Ridder.com and the Akron Beacon Journal are not proper Defendants in this defamation action and they are accordingly dismissed" J.E. at 5 (emphasis omitted).
 {¶ 101} Appellants stated in a footnote in their brief that they are not appealing the dismissal of P. Anthony Ridder, KnightRidder.com, Inc. or Knight-Ridder, Inc. Thus, upon remand they are not parties to the libel action. However, for the sake of clarity we will address whether the remaining parties are proper defendants in the libel action.
 The Beacon Journal Publishing Company {¶ 102} A newspaper has no greater rights in reporting than a private individual and can be held accountable for defamatory matter appearing in it pages. 35 Ohio Jurisprudence 3d (2002), Defamation and Privacy, Sections 94, 109. In the judgment entry granting summary judgment to all appellees, the trial court found that the Akron Beacon Journal was not a proper defendant in the suit and granted them summary judgment. It is assumed that the court was referring to appellee Beacon Journal Publishing Company. There is no reasoning provided for this conclusion. Without any rationale, it is unclear as to why the court would dismiss as a party the very newspaper that published the allegedly defamatory article. Therefore, appellee Beacon Journal Publishing Company is a proper defendant in this action.
 John L. Dotson, Jr. {¶ 103} As previously stated, appellee Dotson was the president and publisher of the Akron Beacon Journal newspaper. There is no evidence that appellee Dotson was aware of the contents of the allegedly defamatory article before it was published. However, this is of no consequence because a publisher is not privileged in the realm of defamation law and he is liable for what he publishes, the same as an individual would be.Cleveland Leader Printing Co. v. Nethersole (1911), 84 Ohio St. 118,133.
 {¶ 104} Any act by which a defamatory statement is communicated to a third party is a publication. Hecht v. Levin (1993), 66 Ohio St.3d 458,460. Consequently, a person who "requests, procures, or aids or abets in the publication of defamatory matter is liable." Scott v. Hull (1970),22 Ohio App.2d 141,144, quoting Corpus Juris Secundum 231, Libel and Slander, Section 148.
 {¶ 105} As the publisher of the newspaper, appellee Dotson played a part in the publication of the allegedly defamatory article. Therefore, appellee Dotson is a proper party to this action and should not have been granted summary judgment.
 Janet C. Leach {¶ 106} Appellee Leach was the editor of the Akron Beacon Journal newspaper. "The managing editor of a newspaper is individually liable for a libel printed in his newspaper, even though [s]he does not have actual knowledge of the libel printed." Goudy v. Dayton Newspapers, Inc.
(1967), 14 Ohio App.2d 207, paragraph three of the syllabus. Accordingly, appellee Leach is a proper party regardless of what knowledge she may or may not have had regarding the article and should not have been granted summary judgment in this action. As such, upon remand, the proper parties to the litigation are Margaret L. Newkirk, The Beacon Journal Publishing Company; John L. Dotson, Jr.; and Janet C. Leach.
 CROSS-ASSIGNMENT OF ERROR NUMBER ONE {¶ 107} In their first cross-assignment of error, appellees allege:
 {¶ 108} "The court of common pleas erred in finding that the statements purportedly attacking murray's integrity were not subject to innocent construction."
 {¶ 109} As discussed earlier, because the innocent construction rule states that if allegedly defamatory words are susceptible to two meanings the innocent meaning should be adopted and the defamatory meaning rejected, the innocent construction rule is incompatible with statements that are defamatory per se. Because this court found the statements attacking appellant Murray's integrity to be defamatory per se, the innocent construction rule cannot apply.
 {¶ 110} Even if the innocent construction rule was applicable to statements that are defamatory per se, it must be remembered that the rule "protects only those statements that are reasonably susceptible of an innocent construction." McKimm, 89 Ohio St.3d at 146, citing Yeager,6 Ohio St.3d at 372 (emphasis in original). Therefore, the court cannot construe a statement in an unreasonable manner so as to give it an innocent meaning. Id. Instead, the rule requires that the words be given their "natural and obvious meaning." Id. As was previously stated, there is no reasonable innocent meaning that can be garnered from the statements attacking appellant Murray's integrity. Seeing as such, this cross-assignment of error is without merit.
 CROSS-ASSIGNMENT OF ERROR NUMBER TWO {¶ 111} In their second cross-assignment of error, appellees contend,
 {¶ 112} "The court of common pleas erred in finding that the statement `if the boich brothers were the quiet voice of coal in the 1990's, `Honest Bob' Murray — as his competitors jokingly call him — was the loud one,' is not substantially true."
 {¶ 113} Whether a defamatory statement is substantially true is a question of fact. Sweitzer, 133 Ohio App.3d at 110. The trial court could not properly conclude whether a statement was true without improperly invading the province of the jury. Therefore, this cross-assignment of error is without merit.
 CROSS ASSIGNMENT OF ERROR NUMBER THREE {¶ 114} In their third cross-assignment of error, appellees assert,
 {¶ 115} "The court of common pleas erred in finding the statements `even his friends roll their eyes at his hyperbole' and `or former coal lobbyist neal tostenson: `he tends to exaggerate a good bit,' are not constitutionally protected statements of opinion."
 {¶ 116} Statements of opinion are constitutionally protected statements that cannot be the basis of a claim for defamation. See Vail,72 Ohio St.3d at 282. To determine whether a statement is constitutionally protected opinion, the court must examine the totality of the circumstances in which the statement was made. Scott v. NewsHerald (1986), 25 Ohio St.3d 243, paragraph one of the syllabus. When considering the totality of the circumstances, the court must take into account the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared. Vail, 72 Ohio St.3d 279, at the syllabus.
 {¶ 117} When considering the specific language used in a newspaper article, the court must determine whether a reasonable reader would view the language as factual in nature or as an opinion. Id. at 282. In the instant case, the statement in no way indicates that it is merely an opinion. Rather, the sentences are presented as objective statements of fact.
 {¶ 118} Next, we must look to whether the statement is verifiable, or rather whether the author implies that the statement is verifiable. Id. at 283. In the instant case, appellee Newkirk presents the entire article as a collection of verifiable facts. She cites numerous sources for the statements. It ran as a part of a series presented to be based wholly in fact. Therefore, the statements presented as verifiable.
 {¶ 119} Along these lines, the remaining two factors of the test also suggest that the statements were statements of fact. The general context of the sentences, as is stated above, was an article that contained quotes and facts. The article did not appear in the opinion or editorial portion of the newspaper, nor was it labeled as comment, opinion or editorial. Nothing in the tone or the actual words used express or imply that it is anything but fact.
 {¶ 120} As for the broader context of the article, it was run as a part of what was billed as an investigative series that resulted from the collaboration of several Akron Beacon Journal reporters. Although the rest of the series is not a part this record, appellees themselves aver that the team of editors and reporters assigned to work on the series were to study and report on "the interplay on politics, power economics in Ohio as related to" the Ohio coal industry. Appellees brief p. 7. Assuming that they came close to achieving this goal, there would be no reason for a reader to accept the information contained in the series as anything but fact.
 {¶ 121} For the above stated reasons, the totality of the circumstances surrounding these sentences reveal them to be statements of fact, and not constitutionally protected opinion. This cross-assignment of error is without merit.
 CONCLUSION {¶ 122} For the foregoing reasons, appellants' assignment of error has merit. The four statements are, as a matter of law, defamatory per se. However, a question of fact remains as to whether the statements are substantially true and were stated with actual malice. Therefore, the judgment of the trial court is hereby reversed and this case is remanded for proceedings according to law and consistent with this Court's opinion.
Waite, P.J., and DeGenaro, J., concur.
[1] "If the Boich brothers were the quiet voice of coal in the 1990s, `Honest Bob' Murray — as his competitors jokingly call him — was the loud one.
"Murray owns the second-largest mine still operating in Ohio, the Powhatan No. 6 mine of the Ohio Valley Coal Co. in Alledonia.
"Inside it, hundreds of miners commute an hour underground to get to the mine face where Murray produces millions of tons of high-sulfur coal per year.
"Unlike the Boich brothers, Murray's tracks are all over public policy on Ohio coal and Ohio clean-air policy.
"Murray was instrumental in the $1-per-ton tax credit offered to Ohio utilities in the 1990s for burning Ohio coal. The credit would cost the state $72 million in taxes over the next nine years.
"In letters headed `Dear Gov. George,' Murray also railed for years that the tax credit didn't go far enough.
"And it was Murray, largely, who convinced state legislators a little more than a year ago that the tax credit that hadn't worked at $1 per ton would work better at $3 per ton.
"The tripled tax credit allowed Murray to beat out a competitor from across the Ohio River, Consol Energy.
"Murray yells a lot.
"He yells about utility companies, influence peddlers, a group that wants him to stop digging coal under old-growth forests, Al Gore.
"He yells about the moniker `coal baron.'
"`I'm the coal baron,' he shouts, sitting in his shirt sleeves, neck in a brace, arms waving, face getting red.
"`That's what people call me. You couldn't pick me out of a crowd of coal miners, but I'm a coal baron.'
"`People say I'm paternalistic. I'm not paternalistic.'
"He's wrong about that.
"Murray employs the second-largest number of miners in the state. And, as he's prone to reminding anyone, he does it all for them.
"`I'm just a homegrown boy trying to keep the people in this part of Ohio working,' he said.
"`The thing they say about me in Columbus and Cleveland is that it's all about the people, even if it's ultimately to my benefit, too.' [sic]
"`The only thing I want is a long line at my funeral. I'm sick. I bought my cemetery plot.'
"Even the unions love Murray, according to Murray.
"`You call Cecil Roberts,' he urged. `You ask him. He'll tell you all about me.'
"Cecil Roberts is head of the national United Mine Workers union and was, according to a spokesman, somewhat mystified by Murray's use of him as a reference.
"Even his enemies concede that he's a very good coal miner.
"Even his friends roll their eyes at his hyperbole. `He goes around saying his daddy knew my daddy,' said Ohio UMW head Babe Erdos. `His daddy didn't know my daddy.'
"Or former coal lobbyist Neal Tostenson: `He tends to exaggerate a good bit.'
"He proselytizes to his workers monthly, sharing his wisdom about mining, the future of environmental regulation and the virtue of Republicans.
"And he never lets them forget who's boss.
"`I am hereby giving you the courtesy of knowing that I owe no member of the local union 1810 mine committee anything, including a job,' Murray wrote in a raging memo to union leaders last year.
"`You foolish people have destroyed any good will you had with me, and I have been the only reason that your job has existed for many years.'
"Murray, according to Murray, is going to be the last man standing when the pendulum swings back to Ohio coal.
"New environmental regulations, combined with deregulation in the power industry, will make Ohio's high-sulfur coal competitive again, he said.
"`They're going to be looking for Ohio coal. And voila! Here's an old man that kept it together.' [sic]
"`If coal survives, it will be because one old man was willing to keep it going and absorb the losses.'"